IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BASIL A. FRYE | ) | FILED: MAY 14, 2008 |
| | ) | 08CV2794        PH |
| Plaintiff, | ) | JUDGE CASTILLO |
| | ) | MAGISTRATE JUDGE SCHENKIER |
| v. | ) | No. |
| | ) | |
| THOMPSON STEEL COMPANY, INC., | ) | |
| a Massachusetts Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

NOW COME the Plaintiff, BASIL A. FRYE, by and through his attorneys, MOMKUS McCLUSKEY, LLC, and for his Verified Complaint for Declaratory Judgment and Other Relief against the Defendant, THOMPSON STEEL COMPANY, INCORPORATED, states as follows:

### NATURE OF ACTION

1.      This case arises under §1132(a)(1)(B) of the Employee Retirement Income Security Program ("ERISA") and pertains to whether the Plaintiff's pension benefits may be offset by his worker's compensation award under the terms of his pension agreement with the Defendant.

### PARTIES

2.      Basil A. Frye ("Frye") is a resident of Franklin Park, Cook County, Illinois and is a former employee of Thompson Steel Company, Incorporated ("Thompson Steel"). Frye was born on July 30, 1943 and is currently sixty-four (64) years old.

3.      Upon information and belief, Thompson Steel is a Massachusetts corporation with its principal place of business located at 120 Royall Street Canton, Massachusetts. Thompson Steel is in the business of producing and supplying steel products. Thompson Steel operated a branch location in Franklin Park, Illinois until May

of 2007, at which time it permanently closed.  See March 9, 2007 letter from Thompson Steel to Frye attached as Exhibit A.

## JURISDICTION

4.      Pursuant to §1132(e)(1) of ERISA, federal and state courts have concurrent jurisdictions of civil actions that arise under §1132(a)(1)(B).

5.      Because Frye is a participant of an employment benefit plan and because he seeks to enforce his rights under the terms of the plan, to recover benefits due to him under the terms of his plan, and to clarify his rights to future benefits under the terms of his plan, he properly brings this action under §1132(a)(1)(B).  Therefore, this Court has jurisdiction over this action under §1132(e)(1).

## BACKGROUND

6.      Thompson Steel employed Frye as a steelworker from 1964 to 2007, for approximately 43 years.

7.      For thirty-three (33) years, Frye participated in Thompson Steel's defined benefit pension plan until December 31, 1997, when that plan ceased and Thompson Steel negotiated with United Steelworkers of America, AFL-CIO to form a Section 401(k) defined contribution pension plan for its employees.  The Supplemental Agreement Covering Pensions ("Supplemental Agreement") is attached hereto as Exhibit B.  On or about January 1, 1998, Frye began contributing to his 401(k) defined contribution pension plan.

8.      On July 18, 2005, Frye was injured while working at Thompson Steel and suffered a strain in his right shoulder.  As a result of the injury, Frye was forced to take time off from work, but returned to work permanently on January 9, 2006.  This injury resulted in a worker's compensation claim before the Illinois Worker's Compensation Commission, no. 07 WC 24984.  As a result of the claim settlement, Frye was awarded $48,597.06.  A copy of the final order in that case is attached hereto as Exhibit C.

2

9.     On July 12, 2006, Frye was injured while working at Thompson Steel and suffered a contusion in his left leg.  Frye was able to continue working immediately after this injury occurred and took no time off from working as a result of this injury.  This injury resulted in a worker's compensation claim before the Illinois Worker's Compensation Commission, no. 07 WC 24985.  As a result of the claim settlement, Frye was awarded $35,291.50.  A copy of the final order in that case is attached hereto as Exhibit D.

10.     Frye continued to work at Thompson Steel until May 11, 2007, when Thompson Steel closed its Franklin Park, Illinois branch.  Frye's July 2005 and 2006 injuries are unrelated to his decision to retire.

11.     On May 30, 2007, Frye received a letter from Thompson Steel stating that his worker's compensation settlements will be used to offset his pension payments, commencing on June 1, 2007.  A copy of this letter is attached hereto as Exhibit E.  Thompson Steel stated that "this will result in a deferral of eight (8) years and two (2) months before [Frye] will be eligible to begin receiving benefits under the plan." (Exhibit E).

12.     On February 14, 2008, Frye received another letter from Thompson Steel stating that, because of the change in his total settlement amount for his worker's compensation case, Frye will not receive his monthly pension benefit until July 1, 2017.  A copy of this letter is attached hereto as Exhibit F.

13.     Frye's monthly pension benefit is $688.13 and was scheduled to be paid beginning in September, 2007.  (Exhibit E, page 2).

**COUNT I - DECLARATORY JUDGMENT**

14.     In its May 30, 2007 letter, Thompson Steel states that it bases its decision to offset pension payments on Article 4, Section 4.18 of the Supplemental Agreement, which provides for the deduction of "any amount paid to or on behalf of any Employee or

3

Pensioner on account of injury or occupational disease causing disability in the nature of a ***permanent disability*** for which the Company is liable." (Emphasis added). (Exhibit B, page 20).

15.    Section 3.4 of the Supplemental Agreement states that the terms "disability" and "disabled" shall have the same meanings as the phrases "permanent incapacity" or "permanently incapacitated," respectively. (Exhibit B, page 12).

16.    Section 3.4 of the Supplemental Agreement also states the following:

> "An Employee shall be deemed to be permanently incapacitated (as the term "permanently incapacitated" is used herein) and shall be retired only **(i)** if he has been totally disabled by bodily injury or disease so as to be prevented thereby from engaging in any occupation or employment for remuneration or profit and **(ii)** if such total disability shall have continued for a period of six consecutive months and, in the opinion of a qualified physician, it will be permanent and continuous during the remainder of his life." (Exhibit B, page 12).

17.    At no time before, during or after Frye was injured at Thompson Steel did he have a permanent disability or was permanently incapacitated within the meaning of the definition of those terms in the Supplemental Agreement. As a result of his shoulder injury, Frye was unable to work from October 21, 2005 to January 8, 2006, at which point he returned to work and worked for another ***sixteen (16) months*** before Thompson Steel shut its doors and Frye retired.

18.    Frye's injuries for which he received worker's compensation have not prevented him from "engaging in any occupation or employment for remuneration or profit." (Exhibit B, page 12). Frye simply chose to retire when Thompson Steel closed. Further, even if he did have a "total disability," it never continued for a period of six consecutive months – he missed less than three (3) months of work for his shoulder injury.

19.    Because Frye was not and is not "permanently disabled" within the meaning of the Supplemental Agreement, the language in Article 4, Section 4.18 of the

4

Supplemental Agreement which allows Thompson Steel to offset pension benefits with worker's compensation benefits does not apply to Frye.

20.    Therefore, pursuant to the Supplemental Agreement, Frye was eligible to begin receiving his pension benefits in the amount of $688.13 in September, 2007. Thompson Steel failed to pay those benefits to Frye and should now be obligated to pay benefits from September, 2007 to the present, with interest, and pay the pension benefits to Frye on a monthly basis henceforth.

WHEREFORE, the Plaintiff, BASIL A. FRYE, request a declaratory judgment declaring, finding and ordering:

A.    That this Court declare and adjudicate the rights, obligations and liabilities of Basil A. Frye and Thompson Steel Company, Inc. with respect to the Supplemental Agreement;

B.    That this Court declare and adjudicate that Basil A. Frye does not have a "permanent disability" according to that term's definition in the Supplemental Agreement;

C.    That this Court declare and adjudicate that Basil A. Frye should have started receiving his monthly pension benefits from Thompson Steel Company, Incorporated on September, 2007 in the amount of $688.13 per month;

D.    That this Court declare and adjudicate that Basil A. Frye be paid by Thompson Steel Company, Incorporated for every month since September, 2007 that he did not receive his pension benefit, plus interest;

E.    That this Court declare and adjudicate that Thompson Steel Company, Incorporated is henceforth obligated to pay Basil A. Frye his monthly pension benefits of $688.13 on a monthly basis;

F.    That this Court declare and adjudicate that Thompson Steel Company, Incorporated is obligated to pay for Basil A. Frye's attorneys fees and costs incurred in bringing this action to recoup his pension benefits, pursuant to §1132(g)(1) of ERISA;

5

G.     That this Court enter judgment in Basil A. Frye's favor and against the Thompson Steel Company, Incorporated; and

H.     For any other or further relief this Court deems just and equitable.

Respectfully Submitted,

MOMKUS McCLUSKEY, LLC

By:  _____
     One of His Attorneys

James F. McCluskey
Jennifer L. Moore
Momkus McCluskey, LLC
3051 Oak Grove Drive, Suite 220
Downers Grove, Illinois 60515
630.434.0400
Attorneys for the Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BASIL A. FRYE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| THOMPSON STEEL COMPANY, INC., | ) | |
| a Massachusetts Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## **VERIFICATION**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
Basil A. Frye

James F. McCluskey
Jennifer L. Moore
Momkus McCluskey, LLC
3051 Oak Grove Drive, Suite 220
Downers Grove, Illinois 60515
630.434.0400
Attorneys for the Plaintiff

W:\26_59\4174.070370\Pleadings\Complaint.doc

7



# THOMPSON
# T DAYTON
## STEEL SERVICE

February 14, 2008

Mr. Basil Frye
3100 Emerson Street
Franklin Park, IL 60131

Dear Basil:

I received notification from Liberty Mutual of your revised settlement amount of your two (2) Workers' Compensation cases. Based on your new settlement amount of $83,889.56, the start of your pension will be delayed until July 1, 2017.

Your pension payment record will be revised to indicate the new deferral period and no further action is required on your part. Please notify the Human Resources Office at 120 Royall Street, Canton, MA 02021 if your permanent address changes.

Sincerely,

Andrea Breheny
Human Resources Manager



EXHIBIT

tabbies

F

120 Royall Street, Canton, MA 02021 • TEL: 781-828-8800 • FAX: 781-828-5082 • www.thompsondayton.com

FROM :

FAX NO. :7084098515                      Feb. 19 2008 04:11PM P1

# THOMPSON STEEL COMPANY, INC.

**Executive Offices**
120 Royall Street, Canton, MA 02021
TEL: (781) 828-8300. FAX: (781) 828-5082

March 9, 2007

Mr. Basil Frye
3100 N. Emerson Street
Franklin Park, IL 60131

Re:    Notification of Plant Closing

Dear Mr. Frye,

I regret to inform you that, due to a general lack of business, the decision has been made
to close the Franklin Park Facility.

This letter is intended to comply with the requirements of the federal law known as the
Worker Adjustment and Retraining Notification Act (WARN), as well as its state law
equivalent, and to supply you with information concerning the closing of the Thompson
Steel Company, Inc. Franklin Park facility located at 9470 King Street, Franklin Park,
IL 60131.

This closing will be permanent and affect all Thompson Steel Company employees at this
location. Layoffs will commence on or about May 11, 2007, and it is expected that you
would be laid off at that time.

Layoffs will be conducted in accordance with the seniority provisions of the Collective
Bargaining Agreement. No bumping rights exist in connection with this layoff.

Thompson Steel Company will notify the State of Illinois to see what services will be
available to dislocated workers. We will keep you informed of these efforts. Otherwise,
if you have questions on the planned plant closing, you may contact me at
(781) 828-8800, ext. 331.

Sincerely,

Andrea Breheny
Human Resources Manager





EXHIBIT

A

Boston, MA • Chicago, IL • Dayton, OH • Detroit, MI • Greenville, SC • Hartford, CT • Los Angeles, CA • Paulding, OH • Rome, GA

APR. 18 2008 11:08AM P1        FAX NO. : 7084082315        FROM :

Susan L. Frye
3100 Emerson St.
Franklin Park, IL 60131-2621

SUPPLEMENTAL AGREEMENT

COVERING PENSIONS

BETWEEN

THOMPSON STEEL COMPANY, INC.

FRANKLIN PARK PLANT

AND

UNITED STEELWORKERS OF AMERICA

AFL - CIO

ON BEHALF OF:

LOCAL UNION NO. 7773

**SEPTEMBER 10, 1997**

TO

**SEPTEMBER 10, 2000**

EXHIBIT

B

## TABLE OF CONTENTS

Page

SUPPLEMENTAL AGREEMENT
COVERING PENSIONS............................ 1

PREAMBLE TO DEFINED BENEFIT PLAN.................... 2

ARTICLE 1     DEFINITIONS................................. 3

ARTICLE 2     CONTRIBUTIONS BY THE COMPANY AND
MANAGEMENT OF FUNDS........................ 6

ARTICLE 3     ELIGIBILITY FOR RETIREMENT.................. 10

ARTICLE 4     AMOUNT OF PENSIONS.......................... 13

ARTICLE 5     PAYMENT OF PENSIONS......................... 26

ARTICLE 6     SPOUSE'S BENEFITS........................... 37

ARTICLE 7     DETERMINATION OF CONTINUOUS AND
CREDITED SERVICE............................ 44

ARTICLE 8     ADMINISTRATION.............................. 48

ARTICLE 9     APPEALS PROCEDURE........................... 48

ARTICLE 10    GENERAL PROVISIONS.......................... 49

ATTACHMENT    THOMPSON STEEL COMPANY, INC.
USWA LOCAL 7773 SECTION 401(k) PENSION PLAN

## SUPPLEMENTAL AGREEMENT

### COVERING PENSIONS

This Supplemental Agreement made and entered into this **23rd day of December 1997**, by and between **THOMPSON STEEL COMPANY, INC.,** a Massachusetts corporation **(the "Company"), acting** with respect only to the Employees of the Company who are members of the Local 7773 bargaining unit at its Franklin Park, Illinois, plant and **UNITED STEELWORKERS OF AMERICA, AFL-CIO**, acting on behalf of the members of that bargaining unit **(the "Union")**.

### WITNESSETH

WHEREAS, the Company and the Union have agreed to and desire to memorialize certain changes in the Supplemental Agreement Covering Pensions dated December 16, 1976 as amended June 30, 1977, September 25, 1978, June 15, 1979, October 31, 1985 and October 28, 1986 (the "Agreement"); and

WHEREAS, the Company and the Union have agreed that the defined benefit pension plan heretofore established and maintained pursuant to the Agreement shall be frozen as of December 31, 1997 and that a Section 401(k) defined contribution pension plan shall be established and maintained effective from and after January 1, 1998; and

WHEREAS, the Company and the Union desire to further amend and restate the Agreement as necessary to enable the defined pension plan to comply with the provisions of the Small Business Job Protection Act of 1996, the Taxpayer Relief Act of 1997, and other laws and regulations enacted since the said plan was last amended;

1

**PREAMBLE**

NOW THEREFORE, the Company and the Union do hereby amend and restate the Plan in its entirety, effective as of December 31, 1997, except as otherwise provided below, to incorporate the amendments made hereby and all prior effective amendments, by deleting each and every section and all headings and captions thereof, and inserting in lieu of all such deleted material the provisions which follow, subject, however, to receipt of a favorable determination from the District Director of Internal Revenue that the Agreement as so amended continues to meet the requirements for qualification under section 401(a) of the Internal Revenue Code of 1986 (the "Code"). The Company and the Union intend that the Agreement as amended and restated shall continue to meet the requirements of the Code, in addition to the requirements of the Employee Retirement Income Security Act of 1974, and that the trust funds which fund the Agreement continues to be tax-exempt under section 501(a) of the Code.

Except as otherwise provided below (i) the provisions of the Plan as amended and restated shall apply to benefits paid or payable to Employees who retire, die or terminate under this Agreement after December 31, 1997 and (ii) benefits payable to Employees who retire, die or terminate prior to January 1, 1998 shall be governed by the terms of the Agreement in effect as of the date of retirement, death or termination.

## PREAMBLE TO DEFINED BENEFIT PLAN

Any other provision of this Agreement to the contrary notwithstanding, it is the intent and purpose hereof to maintain the Plan as a "frozen" defined benefit pension plan from and after December 31, 1997, and therefore,

    (1)    The Plan shall be maintained for the benefit of Employees who had become participants in the Plan prior to January 1, 1998; in no event shall any other Employee become a participant in the Plan after December 31, 1997;

2

**ARTICLE 1**

      (2)      No additional benefit amount shall be accrued under the Plan for any Employee with respect to or on account of any service of the Employee after December 31, 1997;

      (3)      Benefits accrued under the Plan through December 31, 1997 shall be payable to or in respect of Employees when the Employee dies, retires or otherwise terminates employment, subject to the provisions of the Plan relating to eligibility for benefits.

**ARTICLE 1**

**DEFINITIONS**

      Wherever used herein, unless the context clearly indicates otherwise, the following words and phrases shall have the meanings herein specified, and the following definitions shall be equally applicable to both the singular and plural forms of any of the terms herein defined. The masculine pronoun wherever used herein shall include feminine and neuter genders and the singular number as used herein shall include the plural and the plural the singular unless the context clearly indicates a different meaning.

**1.1**      "Basic Agreement" shall mean the collective bargaining agreement between the Company and the Union covering rates of pay, hours of work and other basic terms and conditions of employment, which is in effect during the life of this Plan and is applicable to the Local 7773 bargaining unit.

**1.2**      "Board" shall mean the board established pursuant to **Article 8**.

**ARTICLE 1, 1.3**

**1.3**    "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

**1.4**    "Company" shall mean Thompson Steel Company, Inc., a Massachusetts corporation.  Prior to June 1, 1974 the business of the Company was conducted as Thompson Wire Company, a division of The Paul Revere Corporation, as Avco Thompson Steel Division, a division of The Paul Revere Corporation, and as Thompson Wire Company.  For purposes of determining Continuous Service and Credited Service and for the purposes of section 4.6, Company shall also mean and include the three entities delineated in the preceding sentence.

**1.5**    "Continuous Service" shall have the meaning stated in section 7.1.

**1.6**    "Credited Service" shall have the meaning in section 7.2.

**1.7**    "Early Retirement Date" of an Employee shall mean either **(i)** his "unreduced early retirement date," which is the date on which the Employee completes **thirty** (30) years of Continuous Service or becomes eligible for a 70/75 pension under section 3.2.2, or **(ii)** his "reduced early retirement date," which is the date on which the Employee both completes ten (10) years of Continuous Service and attains age **fifty-five** (55).

**1.8**    "Employee" shall mean any employee of the Company who from time to time during the term of this **Agreement** shall be in the bargaining unit represented by the Union covered by the Basic Agreement and shall include an employee whose Continuous Service, as of the effective date of the pension benefits of this Plan, shall not have been broken within the meaning of section 7.1; provided, however, that in addition to such employees of the Company, the Company at its sole discretion, may include, and cover under the provisions of this Plan any other employee, or group of employees, in the active service of the Company; provided further, that such inclusion shall be nondiscriminatory.

**ARTICLE 1, 1.9**

**1.9**    "Hour" shall have the meaning stated in section 7.2.3.

**1.10**    "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

**1.11**    "Normal Retirement Date" of an Employee shall mean (i) the date on which the Employee attains age sixty-five (65), or (ii) in the case of an Employee who commences participation after attaining age sixty (60), the date such Employee completes five (5) years of participation under his Agreement.

**1.12**    "One Year Break in Service" shall have the meaning stated in section 7.3.

**1.13**    "Pensioner" shall mean a person who is retired and is receiving or is entitled to receive pension benefits described in this Plan.

**1.14**    "Permanently incapacitated", "permanent incapacity" **and "disability"** shall have the meanings stated in section 3.4.

**1.15**    "Plan" shall mean the provisions of the Preamble and Articles 1 through 10 of this Supplemental Agreement Covering Pensions, Local 7773, United Steelworkers of America, AFL-CIO, Franklin Park, Illinois establishing a defined benefit pension plan, as it may from time to time hereafter be amended.

**1.16**    "Social Security Retirement Age" shall mean (i) age sixty-five (65) for persons born prior to January 1, 1938, (ii) age sixty-six (66) for persons born on or after January 1, 1938 and before January 1, 1955 and (iii) age sixty-seven (67) for persons born on or after January 1, 1955.

**1.17**    "Special Payment" shall have the meaning stated in section 4.1.

**ARTICLE 1, 1.19**

**1.19**    "Thompson Wire Profit Sharing Plan" shall mean the Thompson Wire Company Profit Sharing Plan and Trust dated December 27, 1949, as amended.

**1.19**    "Union" shall mean the United Steelworkers of America AFL-CIO, Local 7773.

**1.20**    "Year of Service" shall have the meaning stated in section 7.3.

**ARTICLE 2**

**CONTRIBUTIONS BY THE COMPANY**
**AND MANAGEMENT OF FUNDS**

**2.1**    Funds standing to the account in the Thompson Wire Profit Sharing Plan of individual members who are Employees or Pensioners covered by this Plan will continue for the duration of this Plan to be used as the funds for initial payment hereunder of pension and survivor benefits to such Employees, Pensioners and survivors, including, but without limitation, the survivor benefit protection set forth in Article 6 .  No further contributions shall be made by the Company to or under the Thompson Wire Profit Sharing Plan.  The Company has established certain trusts for pensions (hereinafter sometimes collectively referred to as the "Pension Trusts") which together with the Thompson Wire Profit Sharing Plan accounts of Employees covered by this Plan, shall be used to provide benefits hereunder.  The Profit Sharing Trust established pursuant to the Thompson Wire Profit Sharing Plan, as amended from time to time, shall remain in effect, subject to the terms and conditions thereof and this Plan, and shall continue to be the depository of funds credited to members' accounts thereunder, provided that payout of such funds from the Thompson Wire Profit Sharing Plan to or on behalf of Employees or Pensioners covered by this Plan shall continue to be solely for the purpose of paying pension and survivor benefits in the manner and to the extent provided herein and such payments shall only be in accordance with the terms of this Plan notwithstanding any contrary provision contained in the Thompson Wire Profit Sharing Plan or any beneficiary designation thereunder made by an Employee covered by this Plan.

6

ARTICLE 2, 2.2

**2.2** An independent actuary who is an Enrolled Actuary (as defined in section 3042 of ERISA) will be selected by the Company. The Company shall contribute to the Pension Trust established hereunder, not less than such amounts as are sufficient to meet the minimum funding requirements of ERISA, as may be actuarially determined by such actuary from time to time, based upon such actuarial methods, tables or assumptions as approved by the Company, after taking into account the amounts credited to Employees' and Pensioners' accounts in the Thompson Wire Profit Sharing Plan, for the purpose of providing the benefits set forth in this Plan.

**2.3** The funds contributed by the Company as aforesaid shall be held in the Pension Trust by a Trustee (or Trustees) selected by the Company under a form of trust agreement adopted and executed by the authorized officials of the Company, providing for pensions in accordance herewith and payment of expenses not paid directly by the Company; provided that no part of the corpus or income of such trust shall be used for or diverted to purposes other than for the exclusive benefit of covered Employees and Pensioners under this Plan prior to the satisfaction of all liabilities hereunder for pension benefits; and provided that no person shall have any interest in, or right to, any part of the earnings of such trust pertaining to this Plan, or any rights in, or to, or under such trust or any part of the assets thereof, except as and to the extent expressly provided herein. The Company may amend, modify or terminate the Pension Trusts and each of them or combine or separate them at any time when in its opinion such amendment, modification, termination, combination or separation is necessary or advisable, provided that any such action shall not be inconsistent with the purposes of this Plan, and it may at any time remove or replace any Trustee (or Trustees). All contributions to provide pensions hereunder shall be made by the Company. No Employee or Pensioner shall make any contributions for such purpose nor have any right to compel any accounting, judicial or otherwise, and each such Employee or Pensioner shall be bound by all accountings made by the Trustee (or Trustees) to the Company and approved by it. It is the intention of the Company to make contributions to the Pension Trusts each year, but the

7

**ARTICLE 2, 2.3**

Company may reduce or suspend its contributions at any time as may be actuarially determined by such actuary from time to time based upon such actuarial methods, tables or assumptions as approved by the Company, after taking into account the amounts credited to Employees' and Pensioners' accounts in the Thompson Wire Profit Sharing Plan for the purpose of providing the benefits set forth in this Plan, however, in no event will such contribution be less than the minimum required by ERISA. At its option the Company may make contributions relating to the unfunded past service cost at any time, which are greater than those required hereunder, and in such event may reduce to like extent its contributions in any subsequent year or years.

**2.4    Special Provision.**    To the extent permitted by applicable law and regulations, nothing contained in the Plan shall be deemed to preclude a distribution of an Employee's or Pensioner's Profit Sharing Account to him in a lump sum provided that all of the provisions of this section 2.4 shall have been complied with. As used in this section 2.4, the "Profit Sharing Account" of an Employee or Pensioner as of any given date shall mean an amount equal to the entire amount credited to his membership account under the Thompson Wire Profit Sharing Plan including interest accumulated and credited thereto to the end of the preceding Thompson Wire Profit Sharing Plan fiscal year.

   **2.4.1**    An Employee or Pensioner, upon making appropriate application therefor, may elect to receive his Profit Sharing Account in a lump sum in lieu of the first installment of any regular pension at the time the same would otherwise be due and payable. In any such application the Employee or Pensioner, as the case may be, shall agree and acknowledge for himself, his heirs and assigns that (i) such distribution constitutes the initial payment of his regular pension, (ii) by reason of such distribution the Company, its officers and agents, the trustees of the Pension Trust and the Trustees of the Thompson Wire Profit Sharing Plan are released and discharged from any other and further liability under this Plan

for payment of any monthly amount of regular pension hereunder until there shall have elapsed a number of months (the "deferral period") equal to the quotient determined by dividing his Profit Sharing Account by the amount of the regular pension actually payable to him pursuant to section 5.1 or sections 5.4 or 5.5, if applicable, and **(iii)** the first monthly installment of any regular pension to which he may be entitled in addition thereto shall be payable for the first calendar month following the completion of the deferral period.

**2.4.2**    If an Employee or Pensioner who shall have so elected to receive a lump sum distribution of his Profit Sharing Account shall die prior to the completion of the deferral period then no further payments shall be due on his account under this Plan except as otherwise provided in sections 2.4.3 and 2.4.4.

**2.4.3**    If an Employee or Pensioner who shall have so elected to receive a lump sum distribution of his Profit Sharing Account shall die prior to the completion of the deferral period and is survived by his spouse or his co-pensioner, then no payment shall be made to his spouse and/or his co-pensioner under sections 5.4, 5.5, or 6.1 until the total of the regular pension payments that would have been made, if no such election had been made, to the Employee or Pensioner pursuant to section 5.1 or sections 5.4 or 5.5, if applicable, prior to his death, plus the total of the payments which would have been paid to his spouse and/or co-pensioner under sections 5.4, 5.5 and/or 6.1, but for the deferral provided by this section 2.4.3, equals his Profit Sharing Account.

ARTICLE 2, 2.4.4

**2.4.4**    If an Employee shall die under circumstances entitling his spouse to benefit payments under sections 6.1 and 6.3, having designated that his Profit Sharing Account should be paid **(i)** to a person other than his spouse, then such designation shall be void and without effect and no lump sum payment of his Profit Sharing Account shall be made to any person, or **(ii)** to his spouse, his spouse may elect to receive his Profit Sharing Account in a lump sum provided that she agrees in writing that no benefits shall be paid to her under sections 6.1 or 6.3 until the total of the payments which would have been paid to the spouse under sections 6.1 and/or 6.3, but for the deferral provided by this clause **(ii)** of this section 2.4.4, equals the Profit Sharing Account payable to her.

**2.4.5**    No married Employee or Pensioner may elect to receive his Profit Sharing Account in a lump sum if it is in excess of $3,500 unless his spouse consents.  Such spousal consent must meet the requirements therefor contained in section 5.4.

### ARTICLE 3

### ELIGIBILITY FOR PENSIONS

**3.1    Normal Retirement.**    Any Employee who shall cease active service on his Normal Retirement Date shall be entitled to receive a normal retirement pension determined in accordance with section 4.2.

**3.2    Unreduced Early Retirement.**

**3.2.1**    Any Employee, who shall complete at least **thirty** (30) years of Continuous Service and who is not eligible for a full immediate pension under any other provision of this Plan, shall be eligible to retire and to receive a normal retirement pension determined in accordance with section 4.2.

ARTICLE 3, 3.2.2

**3.2.2**    Any Employee who shall have had <u>at least **fifteen (15)** years of Continuous Service</u> and **(i)** shall have attained the age of **fifty-five (55)** years and whose combined age and years of Continuous Service shall equal **seventy (70)** or more or **(ii)** whose combined age and years of Continuous Service shall equal seventy-five (75) or more, and **(A)** whose continuous service is broken by reason of a permanent shutdown of plant, department or subdivision thereof or by reason of a layoff or physical disability, or **(B)** whose continuous service is not broken and who is absent from work by reason of (1) layoff resulting from his election to be placed on layoff status pursuant to the provisions of the Basic Agreement applicable to employees affected by a permanent shutdown, or (2) a physical disability or a layoff other than a layoff resulting from an election referred to above and whose return to active employment is declared <u>unlikely by the Company,</u> shall be eligible to retire and receive a pension determined in accordance with section 4.2. Notwithstanding anything to the contrary contained in this Plan, no pension (including any special payment) granted pursuant to this section 3.2.2 shall be payable for any month earlier than the month following the month in which the pensioner was last eligible to receive sickness or accident benefits provided under Company sponsored or non-occupational disability benefits provided under law.

**3.3**    **Reduced Early Retirement.**    Any Employee who shall both complete at least **ten** (10) years of Continuous Service and attain age fifty-five (55) shall be eligible to retire at his sole option and to receive a <u>deferred regular pension</u> determined in accordance with section 4.3.1 commencing after attainment of age **sixty-five** (65). In lieu of the foregoing, such an Employee may elect to receive an immediate reduced regular pension determined in accordance with section 4.3.2.

**3.4**    **Disability Retirement.**    Any Employee who shall have at least **ten** (10) years Continuous Service and who shall have become through some unavoidable cause permanently incapacitated shall be entitled upon his

**ARTICLE 3, 3.4**

retirement to receive a pension determined in accordance with section 4.4. An Employee shall be deemed to be permanently incapacitated (as the term "permanently incapacitated" is used herein) and shall be retired only **(i)** if he has been totally disabled by bodily injury or disease so as to be prevented thereby from engaging in any occupation or employment for remuneration or profit and **(ii)** if such total disability shall have continued for a period of six consecutive months and, in the opinion of a qualified physician, it will be permanent and continuous during the remainder of his life. Incapacity shall be deemed to have resulted from an unavoidable cause unless it **(x)** was contracted, suffered or incurred while the Employee was engaged in, or resulted from his having engaged in, a criminal enterprise, or **(y)** resulted from his habitual drunkenness or addiction to narcotics, or **(z)** resulted from an intentionally self-inflicted injury. Permanent incapacity resulting from any such enumerated cause, or from future service in the armed forces which prevents him from returning to employment with the Company and for which he receives a military pension, shall not entitle an Employee to a pension under this section 3.4. Such pension for permanent incapacity shall continue only so long as such pensioner shall be permanently incapacitated prior to age **sixty-five** (65). The permanency of incapacity may be verified by medical examination prior to age **sixty-five** (65) at any reasonable time. As used herein, the terms "disability" and "disabled" shall have the same meanings as the phrases "permanent incapacity" or "permanently incapacitated", respectively.

**3.5    Deferred Vested Retirement.**

**3.5.1**    Any Employee not eligible to receive a pension under any of the foregoing provisions of this Article 3 whose Continuous Service is broken for any reason, and who at the time of such break in Continuous Service shall have **five** (5) or more years of Credited Service, shall be eligible upon making application therefor in accordance with section 3.6 to receive a deferred vested retirement pension determined in accordance with section 4.5. At the time of the aforementioned break in Continuous Service, the Company shall furnish such an Employee an appropriate written notice of the eligibility requirements and his relevant employment data.

ARTICLE 3, 3.5.2

**3.5.2**    Notwithstanding any provision herein contained to the contrary, if the Plan shall at any time be amended so as to revise the eligibility requirements for a deferred vested pension, then each Employee having **three** (3) years of service as an employee of the Company (determined as of the later of the adoption date or effective date of any such amendment or the date the Employee receives written notice of such amendment), may elect in writing on the forms prescribed therefor by and delivered to the Board within ninety (90) days of receipt of written notice of such amendment, to have his nonforfeitable percentage computed without regard to such amendment.

**3.6**    **Applications.**    Each application for a pension shall be in writing on a form provided by the Board and shall be made to the Board or to such representative as may be designated by it for the purpose. The Board may require any applicant for a pension to furnish to it such information as may reasonably be required. Except as provided in section 5.2.3 and 5.2.4, an Employee will make application for pension within 90 days prior to his retirement.

## ARTICLE 4

## AMOUNT OF PENSIONS

**4.1**    **Special Payment.**    Any Employee eligible to receive a pension pursuant to sections 3.1, 3.2.1, 3.2.2 or 3.3 shall be entitled to receive a special initial pension amount (herein called "Special Payment"), except in the case of an Employee who shall have received a Special Payment with respect to a prior retirement.

**4.1.1**    The Special Payment shall be an amount equivalent to thirteen (13) weeks of vacation pay computed:

13

**ARTICLE 4, 4.1.1 (a)**

(a)     in the case of an Employee entitled to a vacation in the year of retirement, at the rate of pay for such vacation, reduced by the amount of vacation pay received for the year of retirement;

(b)     in the case of an Employee who would have been entitled to a vacation in the year of retirement except for such retirement, at the rate which would have been applicable if he had taken a vacation which terminated on the date of retirement; **and**

(c)     in the case of an Employee not in any event entitled to a vacation in the year of retirement, at the rate of pay applicable to the last vacation to which he was entitled, reduced by the amount of vacation pay received for the year for which he was last entitled to a vacation.

**4.1.2**    Such special payment shall be payable for the first three full calendar months following the month in which retirement occurs if application for pension is made not later than the close of the first month of such three month period; otherwise, it shall be payable for the first three full calendar months commencing with the first day of any subsequent calendar month in which application for pension is made.  Such special payment shall be made in a lump sum within the first full calendar month following the month in which retirement occurs, or within the month following the month in which application for pension is made, whichever is later.

**4.1.3**    As used in this Plan, the words "vacation" and "vacation pay" mean the vacation and vacation pay provided under the vacation section of the applicable Basic Labor Agreement.

**4.2     Regular Pension.**      The amount of any regular pension granted pursuant to sections 3.1, 3.2.1 or 3.2.2 shall be calculated in accordance with 4.2.1 or 4.2.2 below, whichever, after being reduced by the deductions applicable to each as provided in this Article 4, is higher.

**ARTICLE 4, 4.2.1**

**4.2.1**    A monthly amount (hereinafter "percent pension") equal to the average monthly earnings paid to the Employee by the Company during the last 120 full calendar months of Continuous Service prior to January 1, 1979 (or all of the employee's Continuous Service prior to January 1, 1979 if less than 120 full months) multiplied by:

(i)    for an Employee with more than 30 years of Continuous Service, 33% plus a percent determined by multiplying 1.2% by the number of years (and fractions thereof calculated to the nearest month) of his Continuous Service in excess of 30 years, and

(ii)    for an Employee with 30 or less years of Continuous Service, 1.1% multiplied by the number of years (and fractions thereof calculated to the nearest month) of his Continuous Service.

**4.2.2**    For Employees retiring after the following dates, a monthly amount (hereinafter referred to as a "minimum pension") equal to the amount set opposite the such date multiplied by the number of years of an Employee's Continuous Service (or fraction thereof to the nearest month) not including any Continuous Service after December 31, 1997.

| Retirement Date | Month Amount |
|---|---|
| November 11, 1985 | $19.00 |
| September 11, 1991 | $20.00 |
| September 11, 1992 | $21.00 |
| September 11, 1993 | $22.00 |
| September 10, 1994 | $23.00 |
| September 10, 1995 | $24.00 |
| September 10, 1996 | $25.00   $25.00   33 years |

15

**ARTICLE 4, 4.2.3** (a)

**4.2.3**    In the computation of the percent pension under section 4.2.1, if during such 120 calendar months, the Employee:

(a)    shall have been absent from work because of disability or layoff for one or more periods of more than three consecutive calendar months each, there shall be deducted from the total number of months which shall be used in so computing the average monthly earnings of such Employee the aggregate of the calendar months in excess of three in each such period of absence; or

(b)    shall have failed to work in more than twelve entire calendar months because of disability or layoff there shall be deducted from the total number of months which shall be used in so computing the average monthly earnings of such Employee the number of such entire calendar months in excess of twelve. If both the foregoing rules shall be applicable to any Employee, only the rule which shall yield the higher average monthly earnings for such Employee shall be used; provided, however, in the use of this formula for the purpose of section 4.4 before applying the rules set out in (a) and (b) above, there shall be deducted from the total number of calendar months which shall be so used in computing the average monthly earnings of such Employee each full calendar month that he shall have been absent without pay because of total disability during the last six calendar months of such one hundred and twenty calendar month period; months deducted under this provision shall not be counted as months of absence in making the computation under either (a) or (b) above.

**4.2.4**    For purposes of this section 4.2, the term "average monthly earnings" shall be determined on the basis of all compensation paid during the calendar years under consideration as wages by the Company to an Employee excluding amounts in excess of (i) $150,000 for benefits accruing in Plan Years beginning after December 31, 1993 and (ii) $200,000 for Plan Years beginning before January 1, 1994 each as indexed for increases in the cost of living pursuant to section 401(a)(17) of the Code.

**ARTICLE 4, 4.3**

**4.3**    **Section 3.3 Pension.**    The amount of any regular pension granted pursuant to section 3.3 shall be either of the following and the Employee may elect at the time of his retirement:

**4.3.1**    a deferred regular pension, commencing after attainment of age **sixty-five (**65**)**, computed under the provisions of section 4.2 but based only on Continuous Service to the date of early retirement and, with respect to section 4.2.1, on average monthly earnings during the last 120 full calendar months of Continuous Service prior to early retirement;

**4.3.2**    an immediate regular pension commencing at the time of early retirement, equal to the deferred regular pension to which he would have been eligible under section 4.3.1 above had he so elected, reduced by one-half of one percent (0.5%) for each month or major portion thereof by which the Employee is short of attainment of age **sixty-five (**65**)**.

**4.4**    **Disability Pension.**    The amount of any regular pension granted pursuant to section 3.4 shall be determined as follows:

**4.4.1**    Prior to attainment of age **sixty-five (**65**)** and during the period of permanent incapacity such amount shall be the greater of:

(a) $250 per month, subject to all deductions provided for under this Article **4**; or
(b) an amount computed under the provisions of section 4.2 but based only on Continuous Service to the date of retirement for permanent incapacity and, with respect to section 4.2.1, on average monthly earnings during the last one hundred twenty full calendar months of Continuous Service prior to January 1, 1979 (or all his Continuous Service prior to January 1, 1979 if less than 120 full months).

17

**ARTICLE 4, 4.4.2**

**4.4.2** After attainment of age **sixty-five** (65) such amount shall be the amount computed under the provisions of section 4.2 but based only on Continuous Service to the date of retirement for permanent incapacity and, with respect to section 4.2.1, on average monthly earnings during the last one hundred and twenty full calendar months of Continuous Service prior to such retirement.

**4.5    Deferred Vested Pension.**    The amount of any regular pension granted pursuant to section 3.5 shall be the amount computed under section 4.2 (but based on his Credited Service rather than his Continuous Service) and shall be payable as provided in section 5.2.4.

**4.6    Deduction for Certain Pension.**    If any Pensioner entitled to be granted pension benefits pursuant to this Plan is or shall become, or upon application would become, entitled to any annuity, pension or payment of similar kind by reason of any law of the United States of America, or of any foreign country, or of any state, district, territory or subdivision of, or subject to the jurisdiction of any one of the foregoing (hereinafter called a Public Pension), or to any other pension or payment in the nature of a pension from any source or fund (other than the special payment referred to in section 4.1) to which source or fund any of the divisions of the Company shall have directly or indirectly contributed including without limitation, the Thompson Wire Profit Sharing Plan (any such other pension or payment in the nature of pension being hereinafter referred to as Other Pension), then the amount of the regular pension payable to such Pensioner for any period shall be reduced by the amount of any such Public Pension and/or any such Other Pension paid or payable to him or that would upon application become payable to him for the corresponding period; provided, however, that if such Pensioner shall have contributed to the source or fund out of which such Other Pension shall be paid or become payable or would become payable upon application, then the amount by which the regular pension payable pursuant to this Plan for any period shall be reduced in accordance with the foregoing provisions of this section 4.6 shall be decreased by the amount of that part of such Other Pension for the corresponding period which shall be

ARTICLE 4, 4.6

attributable to the contributions which such person shall have made to such source or fund; except that payment of benefits pursuant to the Thompson Wire Profit Sharing Plan shall be integrated with payments of other benefits under this Plan in the manner provided in Article **2** hereinabove; provided further that the amount of any regular pension payable shall not be reduced on account of eligibility for or receipt of an actuarially reduced Public Pension until attainment of the statutory age at which the Public Pension would otherwise be provided without actuarial reduction, and on and after such age any regular pension payable shall be reduced in an amount equal to the amount of the Public Pension prior to any actuarial reduction. As used herein, the term "Public Pension" does not include a pension granted for or on account of military service or payments under state law pursuant to Title I (Old Age Assistance) of the Social Security Act, as amended. The adjustment for Public Pension shall be made not only in the case of one actually receiving a Public Pension, but also in the case of one who would be entitled to receive a Public Pension but is not actually receiving it because he has not made application therefor or is engaged in work for which he is compensated in an amount which is in excess of the limit of earnings under which he is eligible to receive a Public Pension, and the adjustment shall be in an amount equal to the amount of Public Pension which he would have received were such application made or were he not compensated in excess of said limit. Such adjustment (as herein defined and applicable) shall not be increased to reflect any increase in the Public Pension attributable to employment after retirement.

Notwithstanding the foregoing, any amount of regular pension payable to a Pensioner which is computed on the basis of section 4.2.2 shall not be reduced for any Public Pension related to Title II of the Social Security Act, and the amount by which any regular pension payable to a Pensioner which is computed on the basis of the formula set forth in section 4.2.1 is to be reduced for any month under the provisions of this section 4.6 with respect to benefits related to Title II of the Social Security Act shall be $80. For purposes of computing the $80 Social Security Offset as it applies to the amount of a regular pension granted pursuant to section 4.2.1, the $80 Social Security Offset shall be an amount computed by multiplying the $80 Offset by a

**ARTICLE 4, 4.6**

fraction the numerator of which shall be the Employee's total number of years (and fractions thereof to the nearest full month) of Continuous Service under this Plan and the denominator of which shall be the total number of years (and fractions thereof to the nearest full month) of Continuous Service under this Plan he would have had if he had continued in employment until age sixty-five (65).

**4.7     Deduction for Severance Payments.**     If any Pensioner is or shall become entitled to or shall be paid any discharge, liquidation or dismissal or severance allowance or payment of similar kind by reason of any plan of the Company, or in respect of which the Company shall have directly or indirectly contributed, or by reason of any law of the United States of America, of any foreign country, or of any state, district, territory or subdivision of, or subject to the jurisdiction of any of the foregoing, then the total amount paid or payable to him in respect of any such allowance or payment **shall** be deducted from the amount of any regular pension to which such Pensioner would otherwise be entitled under this Plan upon retirement; provided, however, that if such Pensioner shall have contributed to the source or fund out of which such allowance or payment shall be paid or become payable, then the amount which is deducted from or charged against the amount of any such pension in accordance with the foregoing provisions of this section 4.7 shall be decreased by the amount of that part of **such** allowance or payment which shall be attributable to the contributions which such person shall have made to such source or fund.

**4.8     Deduction for Disability Payments.**     Any amount paid to or on behalf of any Employee or Pensioner on account of injury or occupational disease causing disability in the nature of a permanent disability for which the Company is liable, whether pursuant to Workers' Compensation or Occupational Disease laws, or arising otherwise from the statutory or common law (except fixed statutory payments for the loss of any bodily member), and any such payments on account of employment by an employer other than the Company, and any

ARTICLE 4, 4.8

disability payment in the nature of a pension under any federal or state law (subject to the provisions of section 4.6 concerning the deduction of Public Pension related to Title II of the Social Security Act), shall be deducted from or charged against any regular pension payable under this Plan; provided, however, there shall not be deducted from any regular pension payable prior to age sixty-five (65) because of eligibility arising under section 3.4 any payments which shall be received by the Pensioner under Workers' Compensation or Occupational Disease laws for any disability in the nature of a permanent disability.

**4.9     Part-Time Employees.** The provisions of this section 4.9 shall be applicable to any part-time Employee notwithstanding anything to the contrary contained in this Plan. Any Employee who is regularly employed in any calendar year for less than the normal work schedule as defined in the Basic Agreement shall be considered a "part-time Employee". If a part-time Employee works less than 1,000 hours (as defined in section 7.2.3.) in any calendar year, he shall not receive any credit for such year in determining his eligibility for pension under Article 3 or the amount of any pension computed under sections 4.2.1 and 4.2.2. In addition, the amount of any pension determined under section 4.2.2, shall, in the case of any part-time Employee, be reduced to an amount equitably related to the hours worked by him in comparison to the hours worked by other Employees.

**4.10     Maximum Pension.**

**4.10.1**   This section 4.10 is intended to satisfy the requirements imposed by section 415 of the Code which impose statutory limits on the pensions payable under any pension plan as well as under this Agreement and shall be construed in a manner that will effectuate this intent. This section 4.10 shall not be construed in a manner that would impose limitations that are more stringent than those required by section 415 of the Code.

ARTICLE 4, 4.10.2

4.10.2  Notwithstanding anything herein to the contrary, in no event may the annual amount of retirement income paid under the Agreement with respect to an Employee for any calendar year exceed the amount which is the Actuarial Equivalent of a straight life annuity with no ancillary benefits which is equal to the product of (1) and 2) below, where

(1)      is the lesser of (A) 100 percent of the Employee's average compensation for the three (3) consecutive calendar years during which he actively participated hereunder and had the highest annual earnings from the Company or (B) $90,000 (as adjusted from time to time by the Secretary of the Treasury or his delegate pursuant to section 415 of the Code, provided that no such adjustment shall be taken into account before the calendar year for which the adjustment first takes effect); and

(2)      is the ratio, but not more than one (1.0), of (A) the Employee's number of years of Continuous Service (or fractions thereof calculated to the nearest month) [in the case of the limitation contained in section 4.10.2(1)(A)] and number of years of participation (or fractions thereof calculated to the nearest month) [in the case of the limitation contained in section 4.10.2(1)(B)] to (B) ten (10); provided, that if the total annual amount of the Employee's retirement income hereunder does not exceed $10,000 multiplied by the ratio described in section 4.10.2(2) and if the Company has not at any time maintained a defined contribution plan in which the Employee participated, no reduction therein shall be made by reason of this section 4.10.

4.10.3  For calendar years commencing after December 31, 1986, if the payment of retirement income begins before or after the Employee attains his social security retirement age, the dollar limitation prescribed by section 4.10.2(1)(B), shall be decreased or increased in accordance with Treasury Department regulations by adjusting the retirement income so that it is the Actuarial Equivalent of such retirement income beginning at the Employee's Social Security Retirement Age. Notwithstanding the

ARTICLE 4, 4.10.3

definition of "Actuarial Equivalent" herein, all actuarial calculations made pursuant to this section 4.10 shall be made on the basis of an interest rate assumption which is the greater of (i) the actuarial factors contained in section 1.1 or (ii) five (5) percent.

4.10.4   If the Employee also has participated in a defined contribution plan maintained by the Company, the sum of the Employee's "defined contribution plan fraction" and "defined benefit plan fraction," as defined below, may not exceed one (1.0) for any calendar year.  Where necessary, in accordance with regulations prescribed by the Treasury Department, an amount shall be subtracted from the numerator of the defined contribution plan fraction so that the sum of the defined benefit plan fraction and the defined contribution plan fraction does not exceed one (1.0) for the calendar year ending December 31, 1986.

4.10.5   For purposes of applying the limitations described in this section 4.10, (i) all defined benefit plans (whether or not terminated) of the Company shall be treated as one defined benefit plan, and all defined contribution plans (whether or not terminated) of the Company shall be treated as one defined contribution plan,  and (ii) "Company" shall mean not only the Company but also corporations which are members of the same controlled group of corporations as the Company (within the meaning of sections 414(b) and 415(h) of the Code), and the term "Employee" shall include a Pensioner except where the context clearly indicates otherwise.

23

**ARTICLE 4, 4.10.6**

4.10.6   For purposes of this section 4.10, the following definitions shall apply:

(1)     "defined contribution plan" means any plan which is qualified under section 401(a) or 403(a) of the Code and which provides for an individual account for each participant and for benefits based solely on the amount contributed to the account, and any income, expenses, gains, losses and forfeitures that may be allocated to such account;

(2)     "defined benefit plan" means any plan which is qualified under section 401(a) and 403(a) of the Code and which is not a defined contribution plan;

(3)     "defined contribution plan fraction" means a fraction, the numerator of which is the sum of the annual additions to the Employee's account or accounts as of the close of the calendar year, and the denominator is the sum of the lesser of the following amounts for such calendar year and for each prior year of continuous service: (i) 1.25 multiplied by the dollar limitation in effect under section 415(c)(1)(A) of the Code for that calendar year (determined without regard to section 415(c)(6) of the Code), or (ii) 1.4 multiplied by the amount that may be taken into account under section 415(c)(1)(B) of the Code with respect to the Employee for calendar year; provided that the Board may, in accordance with applicable Treasury Department regulations, elect to calculate the denominator of the defined contribution plan fraction in accordance with section 415(e)(6) of the Code.

(4)     "annual additions" means the sum of the following amounts which, without regard to this section 4.10, would have been credited to the Employee's accounts for any calendar year: (I) employer contributions on behalf of the Employee to a defined contribution plan maintained by

the Company; (ii) forfeitures credited to the Employee's account under a defined contribution plan maintained by the Company; (iii) the Employee's nondeductible contributions to a defined contribution plan maintained by the Company; (iv) any amount allocated after March 31, 1984 to an "individual medical benefit account," as defined by section 415(1)(2) of the Code, maintained by the Company on behalf of the Employee; (v) any amount derived from contributions paid or accrued after 1985, in tax years ending after December 31, 1985, which are attributable to post-retirement medical benefits allocated to the account of a "key employee," as defined in section 419A(d)(3) of the Code, under a welfare benefit fund as defined in section 419(e) of the Code.

(5)    "defined benefit plan fraction" means a fraction, the numerator of which is the Employee's projected annual benefit under the defined benefit plan (determine of the close of the calendar year), and the denominator is the lesser of:

(i)    1.25 multiplied by the dollar limitation in effect under section 415(b)(1)(A) of the Code for the calendar year, or

(ii)    1.4 multiplied by the amount that may be taken into account under section 415(b)(1)(B) of Code with respect to the Employee for the calendar year.

(6)    "annual benefit" has the meaning ascribed thereto by section 415(b)(2) of the Code, and "annual earnings" means "compensation" within the meaning of section 415(c)(3) of the Code and the Treasury Department regulations thereunder.

**4.10.7**    If the limitation imposed by section 4.10 applies, the benefits hereunder or under any other defined benefit plan shall be reduced, to the extent necessary to satisfy the limitation, before annual additions are reduced.

←    ←

**4.10.8**   Notwithstanding anything in this section 4.10 to the contrary, if, before January 1, 1987, an Employee participated in a defined benefit plan that was in existence on May 5, 1986, and the Employee's current accrued benefit under the plan exceeds the limitation imposed by section 415(b) of the Code, then for purposes of applying subsections (b) and (e) of section 415 of the Code, the limitation imposed by section 415(b) with respect to the Employee shall be equal to the Employee's current accrued benefit.  For purposes of this section 4.10.8, the Employee's "current accrued benefit" shall mean the Employee's accrued benefit (as of December 31, 1986) expressed as an annual benefit (within the meaning of section 415(b)(2) of the Code, as in effect on that date); provided that no changes in the terms and conditions of this Agreement and no cost-of-living adjustments occurring after May 5, 1986 shall be taken into account in determining the Employee's current accrued benefit.

## ARTICLE 5

## PAYMENT OF PENSIONS

**5.1**   **Normal Form of Pension**.        The normal form of regular pension shall be payable in equal monthly installments commencing in accordance with the provisions of section 5.2 and terminating with the monthly payment preceding the death of the Employee.  Notwithstanding the foregoing, if a pension payable to an Employee or Pensioner shall be less than $600.00 per year, payments may be made quarterly if the Board so determines; and if the pension, after deductions, has an actuarial value of $5,000 or less, the Board shall cause it to be paid in a lump sum.

**ARTICLE 5, 5.2**

**5.2**    **Commencement.**

**5.2.1**    The first installment of any regular pension payable under section 4.2 and 4.3.2 shall be for the first full calendar month following the three months for which the Special Payment is made.

**5.2.2**    The first installment of any regular pension payable pursuant to section 4.3.1 shall be for the fourth calendar month following the month in which the Pensioner attains age **sixty-five** (65).

**5.2.3**    The first installment of any regular pension payable pursuant to section 4.4 shall be for the first full calendar month following the month in which retirement occurs if application for such pension is made not later than the end of such full calendar month; otherwise the first installment shall be payable for any subsequent calendar month in which application is made for the pension.

**5.2.4**    The first installment of any regular pension payable to pursuant to section 4.5 shall be for the first full calendar month following the month in which the Pensioner attains age **sixty-five** (65); provided, however, that any Employee eligible for a deferred vested pension and who has completed **ten** (10) years of Continuous Service may, upon attaining age **sixty** (60), elect by making application to the board to have his pension commence prior to age **sixty-five** (65) in an amount equal to the pension he would have received on the month following the month in which he attains age **sixty-five** (65) reduced by one-half of one percent (0.5%) of each month or major portion thereof by which the

**ARTICLE 5, 5.2.4**

employee is short of attainment of age **sixty-five** (65). Such election not to receive a joint and survivor annuity may be made at any time prior to ninety (90) days before benefit payments hereunder commence.

**5.3    Medical Insurance Premiums.** Upon authorization by an Employee, on a form approved by the Board, the amount of premium payable by him, arising from the exercise of his conversion rights for hospital and surgical coverage upon retirement, as provided under the Basic Agreement, shall be deducted from any pension payable under this Plan.

**5.4    Automatic Joint and Survivor Annuity.**      Notwithstanding anything contained in this Plan to the contrary, (i) prior to the time an Employee's net regular pension payments to him hereunder are to commence, the Board shall furnish to him, if he is married, a written explanation of the terms and conditions of the joint and survivor pension form provided under Option 2 of section 5.5.1 and of the effect of an election by the employee not to receive such a joint and survivor pension, and (ii) notwithstanding anything herein contained to the contrary, such a married Employee's net regular pension hereunder shall be paid to him in the form of said Option 2 joint and survivor pension, with his spouse being his co-pensioner, unless he elects in a writing filed with the Board not to receive such a pension. In the case of a married employee any election shall only be effective if it contains the spouse's written consent. The marriage of the Employee shall automatically revoke any previous election. The consent of the spouse shall be effective only if it (i) is in writing, (ii) acknowledges the effect of such election, (iii) is witnessed by a plan representative or Notary Public, and (iv) is delivered to the Board in a form acceptable to the Board. The consent of a spouse need not be obtained if it is established to the satisfaction of the Board that such consent may not be obtained (v) because there is no spouse, (vi)

28

ARTICLE 5, 5.4

because the spouse cannot be located or (vii) because of such other circumstances as the Secretary of the Treasury of the United States may from time to time prescribe by regulation. Any consent made hereunder shall be effective only with respect to such spouse. At any time during the ninety (90) day period ending on the commencement of the payment of pension benefits hereunder, an Employee may elect in writing not to receive his pension benefit in the joint and survivor annuity form. Such election may be revoked by an Employee at any time during the ninety (90) day period referred to in the preceding sentence. Payment of such a joint and survivor pension under this section 5.4 shall commence in accordance with the provisions of section 5.2 notwithstanding anything to the contrary stated in section 5.5.2.

If a married Employee who has not elected not to receive his pension in the form of said Option 2 joint and survivor pension either (iii) dies on or after his Normal Retirement Date while still in the active employ of the Company, or (iv) dies after he separates from the Company's employ on or after his Normal Retirement Date or the date he first becomes eligible for early retirement benefits under section 3.3 but before he commences to receive his pension benefits, his surviving spouse shall be paid a qualified surviving spouse's pension as described in section 6.3.1.

**5.5    Optional Benefit Forms.**

**5.5.1**    Subject to the provisions of section 5.4, an Employee may elect to convert the net regular pension otherwise payable to him under this Plan into a reduced net regular pension, in accordance with one of the options named below, having an equivalent actuarial value:

**(1)    OPTION 1.**    A reduced net regular pension payable during his life, with the provision that after his death such reduced net amount shall continue during the life of and shall be paid to such

beneficiary, to be known as his "co-pensioner", as he shall have nominated by written designation duly filed with the Board or its designated representative. (The benefit described in this section 5.5.1(1) is herein referred to as "Option 1".)

**(2)      OPTION 2.**      A reduced net regular pension payable during his life, with the provisions that after his death one-half of such reduced net amount shall be continued during the life of and shall be paid to such beneficiary, to be known as his "co-pensioner" as he shall have nominated by written designation duly filed with the Board or its designated representative. (The benefit described in this section 5.5.1(2) is herein referred to as "Option 2".)

**5.5.2**      The first installment of reduced net regular pension that shall be payable to an Employee who shall have elected one of the options specified in section 5.5.1 shall be payable for the month for which he is first eligible under section 5.2 to receive a regular pension or the month following the month in which his 65th birthday occurs, whichever is later, and the last installment of such reduced net pension that shall be payable to the Employee shall be payable for the month in which his death shall occur. The first monthly payment that shall be payable to his co-pensioner shall be payable for the month following the month in which such Employee's death shall occur, but not for any month prior to the month for which the Employee was first entitled to receive a reduced net regular pension, and the last monthly payment that shall be payable to such co-pensioner shall be payable for the month in which such co-pensioner shall die; provided, however, that any monthly installments payable to such Employee and remaining unpaid at the time of his death may be paid to his co-pensioner, if then surviving.

**5.5.3**      An election of an option pursuant to this section 5.5 shall be on a form prescribed for the purpose by the Board, shall be signed by the Employee, shall specify which option he thereby elects,

and shall name the co-pensioner of such Employee. Such election shall be deemed to be made when it shall have been received by the Board or its designated representative. Satisfactory proof of age of the named co-pensioner will be required prior to the payment of reduced net regular pension installments under an elected option.

**5.5.4    Subject to the provisions of section 5.4,** any Employee may **(i)** revoke an election previously made under either Option 1 or Option 2 by written notice duly filed with the Board or its designated representative in which event the Employee shall be treated the same as though his optional election has not been filed, or **(ii)** change his election from one to the other of such options and/or change the beneficiary previously named as his co-pensioner by written notice and designation duly filed with the Board or its designated representative.

**5.5.5**    Except as provided in section 5.4, no consent shall be required of the person designated as a co-pensioner in any election under Option 1 or 2 in order to revoke such election.

**5.5.6**    If any Employee shall have elected an option under this section 5.5 and shall die (i) prior to his retirement or (ii) after his retirement and prior to the commencement of pension benefits, such election shall cease to be of any effect, and the co-pensioner shall not be entitled to any payments by reason of the election of such option.

**5.5.7**    If any Employee shall have elected an option under this section 5.5 and his co-pensioner shall die after such Employee shall have retired and commenced to receive pension benefits hereunder, such Employee shall continue to receive reduced net regular pension installments in accordance with such option.

**ARTICLE 5, 5.5.8**

**5.5.8**    If any Employee shall have elected an option under this section 5.5 and his co-pensioner shall die before such Employee shall have retired or commenced to receive pension benefits hereunder, whichever is later, then the Employee shall be treated the same as though his optional election had not been filed.

**5.5.9**    Anything in this section 5.5 to the contrary notwithstanding, if after the retirement of an Employee, who shall have elected Option 1 or 2, the amount of regular pension which would have been payable to him under this Plan had he not elected an option, is subject to any further deduction change, offset or corrections, then the amount payable under an elected option to such Employee and/or his co-pensioner shall be adjusted to reflect any such further deduction, change, offset or correction.

**5.5.10**    Notwithstanding anything to the contrary contained in this section 5.5, a married Employee may not elect a benefit form other than Option 2, change his co-pensioner to someone other than his spouse or otherwise take any action which would prevent his spouse from being his co-pensioner under Option 2 annuity, unless his spouse consents thereto in writing. Such spousal consent must meet the requirements therefor contained in section 5.4.

5.6    For purposes of determining actuarial equivalent values (hereinafter referred to as "Actuarial Equivalents"), the following factors shall apply:

| | |
|---|---|
| Interest Rate: | Five percent (5.00%) |
| Mortality: | 1971 TPFC Forecast Mortality Table with no age setback for Employees and a six (6) year age setback for beneficiaries. |

**5.6.1**   Calculation of Present Value of Benefits.   For purposes of determining the Actuarial Equivalent of a retirement benefit hereunder, the present value of such benefit shall be the greater of (i) the present value of such benefit determined by applying the interest rate and actuarial factors contained in this section 5.6, or (ii) the present value of such benefit determined by using (A) the Applicable Interest Rate, if the present value of the benefit is not in excess of Twenty-Five Thousand Dollars ($25,000.00) or (B) One Hundred Twenty Percent (120%) of the Applicable Interest Rate if the present value of the benefit exceeds Twenty-Five Thousand Dollars ($25,000.00) (determined on the basis of the Applicable Interest Rate), provided that the present value determined on the basis of 120% of the Applicable Interest Rate shall in no case be less than Twenty-Five Thousand Dollars ($25,000.00).   For purposes of this section 5.6.1, the term "Applicable Interest Rate" means the interest rate or rates which would be used by the Pension Benefit Guaranty Corporation, as of the first day of the Plan Year in which the distribution occurs, for purposes of determining the present value of a lump sum distribution on a plan termination.

5.7   Minimum Required Distributions

5.7.1   Any benefit that is payable to or with respect to an Employee shall be distributed or commence not later than the April 1 of the calendar year following the later of (A) the calendar year in which the Employee attains age seventy and one-half (70 1/2), and (B) the calendar year in which the Employee terminates employment from the Company, and shall be distributed, in accordance with Treasury Department regulations, (i) in a lump sum, (ii) over the life of the Employee, (iii) over the joint lives of the Employee and his co-pensioner, (iv) over a period not extending beyond the Employee's life expectancy, or (v) over a period not extending beyond the joint life expectancy of the Employee and his co-Pensioner.

**ARTICLE 5, 5.7.1**

The preceding sentence notwithstanding, (1) an Employee who is not a greater than 5% owner of the Company (as defined in Section 416 of the Code) who attains age 70-1/2 in the calendar year 1997 or 1998 may elect to commence receiving payment of his or her benefits by April 1 of the succeeding calendar year, notwithstanding such Employee's continuation of employment with the Company; and (2) any Employee who terminated employment after the calendar year in which he or she attains age 70-1/2 shall be entitled to receive any optional form of benefit that would have been available if he or she had terminated employment in the year he or she attained age 70-1/2.

**5.7.2**    If distribution of an Employee's benefit has commenced in accordance with section 5.7.1 and the Employee dies before his entire benefit has been distributed to him the remaining portion of his benefit, if any, shall be distributed to his co-pensioner at least as rapidly as under the method of distribution that was in effect as of the date of the Employee's death.

**5.7.3**    If an Employee dies before distribution of his benefit has commenced, any benefit payments that are payable hereunder shall be distributed within five (5) years after the Employee's death; provided, however, that this limitation shall not apply in the case of:

(1)      any portion of the Employee's benefit payable to or for the benefit of a designated beneficiary [ as defined in section 401(a)(9)(E) of the Code] that is distributed (in accordance with Treasury Department regulations) over the designated beneficiary's life or a period not extending beyond his life expectancy commencing within one year after the date of the Employee's death (or such later date as may be specified by Treasury Department regulations), or

ARTICLE 5, 5.7(2)

(2)    any portion of the Employee's benefit payable to his surviving spouse that is distributed over the spouse's life or a period not extending beyond the surviving spouse's life expectancy commencing no later than the date on which the Employee would have attained age seventy and one-half (70 1/2); provided that (i) if the surviving spouse dies before payments to such spouse begin, section 5.7.3 shall apply as if the surviving spouse were the Employee; and (ii) any amount paid to a child of the Employee shall be treated as if it had been paid to the surviving spouse of the Employee if such amount is payable to the surviving spouse upon such child reaching majority (or such other event as may be specified by Treasury Department regulations).

**5.8    Eligible Rollover Distributions**

**5.8.1**    This section 5.8 applies to distributions made after December 31, 1992. Notwithstanding any provision of the Plan to the contrary, a Distributee may elect, at the time and in the manner prescribed by the Company, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.

**5.8.2**    For purposes of this section 5.8, the following definitions shall apply:

(1)    "Eligible Rollover Distribution" shall mean any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include (i) any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated beneficiary, or for a specified period of ten years or more, (ii) any distribution to the extent such distribution is

required under section 401(a)(9) of the Code, and (iii) the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).

(2)    "Eligible Retirement Plan" shall mean an individual retirement account described in section 408(a) of the Code, an individual retirement annuity described in section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified trust described in section 401(a) of the Code, that accepts the Distributee's Eligible Rollover Distribution. However, in the case of an Eligible Rollover Distribution to a surviving spouse, an Eligible Retirement Plan is an individual retirement account or individual retirement annuity.

(3)    "Distributee" shall mean and include an Employee or Pensioner. In addition, the Employee's or Pensioner's surviving spouse and the Employee's or Pensioner's spouse or former spouse who is the alternate payee under a Qualified Domestic Relations Order, are Distributees with regard to the interest of the spouse or former spouse.

(4)    "Direct Rollover" shall mean a payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

**5.8.3**    If a distribution is one to which sections 401(a)(11) and 417 of the Code do not apply, such distribution may commence less than thirty (30) days after the notice required under Treasury Regulation section 1.411(a)-11(c) is given, provided that (i) the Company clearly informs the Employee that the Employee has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option) and, (ii) the Employee, after receiving the notice, affirmatively elects a distribution.

ARTICLE 6, 6.1

## ARTICLE 6

### SPOUSE'S BENEFITS

**6.1**    **Surviving Spouse's Benefit.**    With respect to any Employee who dies after attainment of age **fifty-five** (55), and either **(i)** at a time **(A)** when he is accruing Continuous Service and after he has completed at least 15 years Continuous Service or **(B)** before application for pension and after a break in Continuous Service which occurred after attainment of age **fifty** (50) and under conditions of eligibility for retirement on immediate pension, or **(ii)** after 30 years, 55/10, permanent incapacity, or 70/75 retirement and before attainment of age **sixty-five** (65), if he retired after attainment of age **fifty** (50), his surviving spouse, if any, shall be eligible for a monthly benefit (hereinafter called "surviving spouse's benefit"), as set forth below.

**6.1.1**    Unless the provisions of section 6.1.2 result in a higher amount, the amount of any surviving spouse's benefit payable shall be $200 for any month before the month in which the surviving spouse reaches age **sixty-two** (62) and $100 for any month thereafter.

**6.1.2**    Unless the provisions of section 6.1.1 result in a higher amount, the amount of any surviving spouse's benefit payable shall be determined in accordance with the following:

(1)    If eligibility for such a benefit arises by reason of the death of an Employee covered by **clause (i)** of section 6.1, the monthly amount of the benefit, subject to the provisions of **6.1.2(4), (5), and (6),** shall be equal to 50% of the amount of regular pension, before any reduction other than a deduction required by section **6.3.4,** calculated under the provisions of sections 4.2.1 and 4.2.2 as though the Employee had retired on the date of his death and, in the case of an Employee who dies prior to attaining his **normal retirement date**, as though he had died on his normal retirement date.

ARTICLE 6, 6.1.2 (2)

(2)     If eligibility for such a benefit arises by reason of the death of an Employee covered by **clause (ii)** of this section 6.1, the monthly amount of the benefit, subject to the provisions of **6.1.2(3), (4), (5) and (6)** below, shall be equal to 50% of the amount of regular pension that was payable to the Employee before any reduction other than an applicable actuarial reduction or the deduction required by section **6.3.4**.

(3)     In the case of an Employee who dies after 55/10 retirement and who had elected to defer the commencement of regular pension until after attaining his normal retirement date, the regular pension payable to the Employee shall, for the purposes of applying the provisions of **section 6.1.2(2)**, be deemed to be the amount of regular pension which would have been payable if, under the provisions of this Plan, he had been permitted to and had elected to receive an immediate regular pension commencing with the first month for which the surviving spouse's benefit is payable.

(4)     The 50% rate referred to in section **6.1.2(1) and (2)** shall be reduced by deducting therefrom 1/2% multiplied by the number of years (and fraction thereof calculated to the nearest month) that the surviving spouse is under age fifty (50) as of the first day of the first month for which a surviving spouse's benefit is payable to such surviving spouse.

(5)     Commencing with the first surviving spouse's benefit payable after the surviving spouse attains age sixty-two (62), the amount of the surviving spouse's benefit otherwise payable for any month shall be reduced by 65% of the amount of the widow's or widower's benefit to which the surviving spouse is, or upon application would be, entitled for such month under a law referred to in section 4.6 (without regard to any offset, suspension or reduction imposed by such law,

including a reduction by reason of commencement of the widow's or widower's benefit prior to the age at which it is first provided under law without such a reduction). If the surviving spouse is not eligible for such a widow's or widower's benefit for such month, the amount of the reduction shall be equal to 65% of the amount of the widow's or widower's benefit that could have become payable to the surviving spouse for such month, based on the Employee's wages, if the surviving spouse had been eligible and had applied for such benefit. After the reduction for a widow's or widower's benefit first becomes applicable, it shall not be changed to reflect any increase in the amount of the widow's or widower's benefit resulting from amendment of such law, if the effective date of the increase occurs after the first month as to which such a reduction becomes applicable.

(6)     If the surviving spouse receives, or upon application would be entitled to receive, any payment derived from rights acquired by the Employee, which would if received by the Employee have been subject to deduction under section 4.6 from any regular pension otherwise payable to the Employee (except any such payment received by the surviving spouse by reason of an election by the Employee to receive a reduced payment), the amount of such payment not attributable to the contributions of the Employee shall be deducted from the surviving spouse's benefit otherwise determined under this section 6.1.2.

(7)     If the law referred to in section 4.6 first provides widow's or widower's benefits without reduction by reason of age other than **sixty-two** (62), "age sixty-two (62)," wherever used in this section 6.1 shall be changed to the age at which such benefit is first provided without reduction by reason of age under such law as most recently amended.

**ARTICLE 6, 6.1.3**

**6.1.3**    The first installment of any surviving spouse's benefit shall be payable for the month following the month in which the Employee shall die, and the last installment shall be payable for the month in which the surviving spouse shall die, provided, however, that a surviving spouse's benefit shall not be payable for any month for which a Special Payment was payable to the Employee.  No surviving spouse's benefit is payable for any month earlier than 12 months before the month in which the surviving spouse files an application for the benefit.  In connection with the application, the Company may require the surviving spouse to grant any authorization necessary to receive relevant records from the agency administering the law referred to in section 4.6.

**6.1.4**    A person shall be considered a surviving spouse for the purposes of this section 6.1 only if, immediately after an Employee's death, such person is a widow or widower of such Employee within the provisions of the Social Security Act, except that where such Act requires reference to the law of the District of Columbia, the applicable law shall be that of the state of Pennsylvania.

**6.1.5**    The Company shall make reasonable effort, by an appropriate method or methods, to inform the surviving spouse of an eligible Employee of the existence of this benefit.

**6.2**    **Lump Sum Death Benefit.**  A lump sum death benefit will be paid from the trust established to fund this Plan (and not from the Thompson Wire Profit Sharing Plan) in the manner hereinafter specified, which shall be in addition to any disbursement or entitlement under the Thompson Wire Profit Sharing Plan, upon the death of a Pensioner receiving pension benefits under this Plan (other than pursuant to section 3.5) as of the date of his death.  The amount of such benefit shall be $2,500.00.  For the purposes hereof, a Pensioner shall be deemed to be receiving pension benefits as of the date

of his death if he had applied for and received lump sum distribution of his Thompson Wire Profit Sharing Plan membership account in the manner provided above and had not completed the monthly installment deferral period as of such date. No death benefit shall be payable, however; by reason of the death of any Pensioner if the life of such Pensioner was insured on the date of his death pursuant to any term of the group insurance plan, or any other insurance program, to which the Company contributes.

The aforementioned death benefit shall be paid to such beneficiary as the Pensioner may have nominated by written designation duly filed with the Board. If the Pensioner has not filed a written designation of beneficiary with the Board prior to his death or if beneficiary nominated by him has predeceased the Pensioner, the said death benefit shall be paid to the spouse, child or children, either parent, other blood relative, or dependent or dependents of the Pensioner as the Board in its sole discretion shall determine, unless claim shall have been made therefor by the Pensioner's duly appointed representative. If the beneficiary nominated by the Pensioner is a minor or is unable to manage his or her affairs, the death benefit shall be paid to the spouse, either parent, or other blood relative of such beneficiary or to the person with whom he or she resides, as the Board in its sole discretion shall determine, unless claim shall have been made therefor by the duly appointed legal representative of such beneficiary. Any payment of a death benefit made in accordance with the provisions of this section 6.2 shall be a complete discharge of all liability under this Plan therefor. The Board shall adopt procedures to be followed for the purpose of carrying out the provisions of this section 6.2 and may require the furnishing of such evidence as it shall deem necessary to support payment.

**6.3     Pre-Retirement Death Benefit.**

**6.3.1**     Unless an Employee executes a waiver to which this spouse consents, the surviving spouse of a covered employee, who dies after having become eligible for a deferred vested pension and before

**ARTICLE 6, 6.3.1**

his pension benefits commence, shall be entitled to receive a qualified pre-retirement survivor annuity, provided that the Employee and spouse had been married throughout the one (1) year period ending on his date of death.  Such annuity shall be the same amount as the spouse as the survivor would have received in the qualified joint and survivor annuity form under subsection 5.4, if:

(i)     in the case of a covered employee who dies after attaining age fifty-five (55), the covered employee had retired with an immediate pension under section 5.4 on the day before his death; or

(ii)    in the case of a covered employee who dies before attaining age fifty-five (55), the covered employee had **(a)** separated from service on his date of death, **(b)** survived to age fifty-five (55), **(c)** retired with an immediate pension under section 5.4 at age fifty-five (55) and **(d)** died on the day after attaining age fifty-five (55).

**6.3.2**    A waiver under section 6.3.1 shall be in a written form acceptable to the Board and shall only be effective if it contains the spouse's consent.  The consent of the spouse must meet the requirements therefor contained in section 5.4.  A waiver may be revoked at any time before the commencement of benefits without the spouse's consent by a writing in form acceptable to the Board.  The remarriage of an Employee to a different spouse shall render any previous waiver ineffective.

**6.3.3**    The Board shall provide each Employee with a written explanation of the qualified pre-retirement survivor annuity during the period commencing with the first day of the Year in which the Employee attains age thirty-two (32) and ending on the last day of the Year in which the Employee attains age thirty-four (34), or in the case of an Employee hired after age thirty-four (34) during the twelve-month period following his date of hire.

ARTICLE 6, 6.3.4

6.3.4    (a) Notwithstanding anything contained in this Plan to the contrary, any pension benefits payable hereunder to or on account of an Employee shall be reduced by the following percentages for each calendar month or major fraction thereof after the Employee receives the explanation required under the preceding paragraph above that the qualified pre-retirement survivor annuity has not been effectively waived by the Employee:

| Age | Applicable % |
|---|---|
| Under 45 | 0.008333 |
| 45 – 54 | 0.016666 |
| 54 – 65 | 0.058823 |

(b) For purposes of section 6.3, a surviving spouse shall begin to receive payments on the first day of the month following the month in which the Employee would have attained age fifty-five (55) or died, whichever is later, unless the surviving spouse elects a later date.

6.3.5    Any pre-retirement death benefit payable under this section 6.3 shall be in addition to the surviving spouse's benefit, if any, payable under section 6.1.

6.4    **Part-time Employees.**  In the case of a surviving spouse of a deceased part-time Employee (as defined in section 4.9), notwithstanding the provisions of sections 6.1 and 6.3, the amounts set forth in sections 6.1 and 6.3 shall be reduced on the same basis as is provided in section 4.9 for the reduction of the pension of a part-time Employee.

ARTICLE 7

ARTICLE 7

DETERMINATION OF CONTINUOUS AND CREDITED SERVICE

**7.1** **Continuous Service.** The term "Continuous Service" as used in this Plan means service prior to retirement calculated from the Employee's hiring date (this means in the case of a break in Continuous Service, Continuous Service shall be calculated from the date of reemployment following the last unremoved break in Continuous Service) in accordance with the following provisions; provided, however, that the last hiring date prior to the effective date of this Plan shall be based on the practices in effect at the time the break occurred:

**7.1.1** There shall be no deduction for any time lost which does not constitute a break in Continuous Service.

**7.1.2** The Continuous Service of an Employee shall be broken by:

(1) quitting or resigning for any reason, including retirement.

(2) discharge for just cause.

(3) failure to report for work at the termination of a leave of absence unless such failure to report is for a just cause which can be substantiated by the Employee to the Company's satisfaction.

(4) layoff of twelve (12) consecutive months for Employees with less than one (1) year of seniority at time of layoff. Layoff of thirty-six (36) consecutive months for Employees with one (1) year or more of seniority at time of layoff.

ARTICLE 7, 7.1.2(5)

(5)    absence for three consecutive working days without proper notification to the Company unless such failure to report is for a just cause which can be substantiated by the Employee to the Company's satisfaction.

(6)    absence due to a physical disability which continues for more than **two** (2) years, except that absence in excess of **two** (2) years due to a compensable disability incurred during the course of employment shall not break Continuous Service, provided the Employee is returned to work within **thirty** (30) days after final payment of statutory compensation for such disability or after the end of the period used in calculating a lump sum payment.

(7)    failure to report to work within five (5) working days from the date of the mailing of the notification of recall from the Company in the form of a registered letter sent to the last known address of the Employee based upon the Company's records unless such failure to report is for a just cause which can be substantiated by the Employee to the Company's satisfaction. A copy of each such registered letter shall be sent to the Union.

(8)    a break in seniority for any other reason; provided, however, that Continuous Service shall not be considered to be broken by absence of the Employee who subsequent to May 1, 1940, entered the military, naval, or merchant marine service of the United States, and who has reemployment rights under the law and complies with requirements of law as to reemployment and is reemployed. Continuous Service shall include service in the employ of one or more of the plants of the Company but shall not include service of Employees in the employ of any company whose stocks or properties may be acquired hereafter unless and only to the extent

ARTICLE 7, 7.1.2, (8)

that at the time of such acquisition credit for Continuous Service for the purpose of pension benefits shall be granted to such Employees.

(9)     absence of an Employee for maternity or paternity reasons which extends beyond the second anniversary of the first date of such absence; provided, however, that the period between the first and second anniversary of such absence shall not be credited as Continuous Service and for purposes of calculating such person's breaks in Continuous Service, the second anniversary date of such person's maternity/paternity absence shall be deemed the date of severance. For purposes of this section 7.1.2(9), an absence from work for maternity or paternity reasons means an absence (i) by reason of the pregnancy of the Employee, (ii) by reason of a birth of a child of the Employee, (iii) by reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or (iv) for purposes of caring for such child for a period beginning immediately following such birth or placement.

7.1.3    Any other provision hereof notwithstanding, Continuous Service of an Employee after December 31, 1997 shall not be taken into account or treated as Continuous Service for purposes of determining the amount of benefit accrued by the Employee.

**7.2**    **Credited Service.**        The term "Credited Service" as used in this Plan shall have the meaning ascribed to Continuous Service in section 7.1, except as otherwise modified by this section 7.2.

**7.2.1**    If an Employee incurs a One Year Break in Service and is later reemployed, any Years of Service prior to such One Year Break in Service shall not be included in determining his years of Credited Service until the Employee shall have completed a Year of Service after his reemployment.

ARTICLE 7, 7.2.2

7.2.2    If an Employee incurs a One Year Break in Service prior to becoming eligible for a deferred vested pension under section 3.5 and is later rehired, any years of service prior to such One Year Break in Service shall not be included in determining his years of Credited Service after reemployment if the number of consecutive One Year Breaks in Service equal or exceeds the greater of (i) five (5), or (ii) the aggregate number of his years of service prior to such One Year Break in Service.

7.2.3    As used in this section 7.2, (i) the term "One Year Break in Service" shall mean any calendar year commencing January 1, 1976 in which the Employee worked **five hundred** (500) hours or less for the Company. Notwithstanding the foregoing, an Employee shall be given credit as hours worked for any period of absence referred to in section 7.1 which does not break the Continuous Service as there defined and for which he would be given credit under the provisions of sections 7.1.1, 7.1.2(4), 7.1.2(6) or 7.1.2(8); and (ii) the term "hour" shall mean each hour of service for which the Employee is directly or indirectly entitled to payment by the Company for the performance of duties during the applicable computation period or for which back pay has been either awarded or agreed to by the Company. Solely, for the purpose of determining whether a One Year Break in Service has occurred, in addition to the hours of service just above stated, "hour" shall include each hour for which the Employee is directly or indirectly paid or entitled to payment by the Company for reason other than the performance of duties during the applicable computation period irrespective of whether these hours occurred in other computation periods; (**x**) the term "Year of Service" shall mean any calendar year in which the Employee worked at least 1000 hours for the Company; (**y**) each Employee shall be given credit as Credited Service for his most recent period of Continuous Service (as defined in section 7.1) ending December 31, 1975; and (**z**) hours of service for periods of time during which no duties were performed will be credited in accordance with Section 2530.200b-2(b) and (c) of the Department of Labor Regulations.

ARTICLE 7, 7.3

**7.3    Retired Employees.**    An Employee who has been retired and receiving a pension and who shall be reemployed, shall have his pension discontinued and shall be credited with his Continuous Service and his Credited Service as of the date of his prior retirement plus his Continuous Service and his Credited Service accruing after reemployment for the purposes of calculating any subsequent pension benefits to which he may become entitled; provided, however, nothing in this section 7.3 shall affect the calculation of Continuous Service as provided in sections 7.1.2(4) and 7.1.2(6).

**ARTICLE 8**

**ADMINISTRATION**

The administration of the pension benefits shall be in charge of a Board, which shall consist of such members from Management, who shall have such authority and perform such duties, as may be determined from time to time by the Company.  Unless the Company shall otherwise determine, the Board shall be the plan administrator, so-called, of this Plan.  The Board, and the plan administrator if other than the Board, shall be named fiduciaries of this Plan.

**ARTICLE 9**

**APPEALS PROCEDURE**

**9.1**    If any difference shall arise between the Company or the Board and (i) any Employee who shall be an applicant for a pension as to such Employee's right to a pension or the amount of his pension or (ii) any other

ARTICLE 9, 9.1

person entitled to receive benefits hereunder on account of an Employee and agreement cannot be reached between the Board and a representative of the International Union, such question shall be referred to an impartial umpire to be selected by the Board and by the Union. The impartial umpire shall have authority only to decide the question pursuant to the provision of this Plan applicable to the question but he shall not have authority to in any way alter, add to or subtract from any of such provision. The decision of the impartial umpire on any such question shall be binding on the Company, the Board, the Union, the Employee and any other person entitled to receive benefits hereunder on account of an Employee.

9.2      If any difference shall arise between the Company and any Employee as to whether such Employee is or continues permanently incapacitated within the meaning of section 3.4, such difference shall be resolved as follows:

The Employee shall be examined by a physician appointed for the purpose by the Company and by a physician appointed for the purpose by a duly authorized representative of the International Union. If they shall disagree concerning whether the Employee is permanently incapacitated, that question shall be submitted to a third physician selected by such two physicians. The medical opinion of the third physician, after examination of the Employee and consultation with the other two physicians, shall decide such question. The fees and expenses of the third physician shall be shared equally by the Company and the Union.

## ARTICLE 10

## GENERAL PROVISIONS

10.1    No pension properly payable pursuant to this Plan shall be discontinued or reduced except as provided in sections 2.4.1, 2.4.2, 2.4.3, 2.4.4, 3.4 and 7.3 and in Articles **4**, **5** and **6**.

ARTICLE 10, 10.2

**10.2** No pension payable under this Plan shall be subject in any way to alienation, sale, transfer, assignment, pledge, attachment, garnishment, execution, or encumbrance of any kind and any attempt to accomplish the same shall be void. The foregoing shall not prevent any distributions made pursuant to a "qualified domestic relations order" as defined in section 414(p) of the Code.

If the Company shall find that such an attempt has been made with respect to any pension payment due or to become due to any Pensioner or co-pensioner, the Company in its sole discretion may terminate the interest of such Pensioner or co-pensioner, his spouse, children, or other relatives or dependents, as the Company may determine, and any such application shall be a complete discharge of all liability with respect to such pension payment.

**10.3** No Employee prior to his retirement under conditions of eligibility for pension benefits shall have any right or interest in or to any portion of any funds which may be paid into any pension trust or trusts heretofore or hereafter established for the purpose of paying pensions and no Employee, Pensioner or co-pensioner shall have any right to pension benefits except to the extent provided in this Plan. Employment rights shall not be affected by reason of the foregoing pension provisions.

**10.4** The Company will distribute this Plan to Employees who are actively at work, to Employees not actively at work as they return to work, and to new Employees; the Company will furnish each Employee who retires at the time of delivery of his first pension check, a notice to the effect that his pension is pursuant to this Plan between the Company and the Union.

**10.5** From and after the date of this Plan, neither the Union nor any of its officers or representatives nor any of the Employees shall:

ARTICLE 10, 10.5.2

      **10.5.1**   make any request that the Company increase the rates of pay of the Employees on account of or for use in paying the cost, in whole or in part, of any program of pension benefits of the Employees; or

      **10.5.2**   make any request that the pension benefits or provisions of this Plan be changed in any respect or terminated or that new pension or similar benefits be established or that the amount which the Company is required by the provisions of this Plan to pay or cause to be paid or provided for pension benefits for the Employees be increased; or

      **10.5.3**   engage or continue to engage in or in any manner encourage or sanction any strike, work stoppage, interruption or impeding of work (at any of the plants of the Company) for the purpose of securing any such increase or any such change or any other action with respect to pensions; and during the term of this Plan the Company shall not have any obligation to negotiate or bargain with the Union with respect to any of the matters covered by or relating to sections 10.5.1, 10.5.2 or 10.5.3.

**10.6**     From and after the date of this Plan the Company shall not change or request any change in this Plan or engage in or sanction any lock-out for the purpose of securing any change.

**10.7**     An Employee whose service is terminated and who has no entitlement of any kind under or pursuant to this Plan to any pension, including but without limitation, deferred vested pension, or to any survivor protection benefit, either to himself, his spouse, heirs, or personal representative, shall receive payment of the total amount credited to his account under the Thompson Wire Profit Sharing Plan, if any, as of November 30, 1970 plus 4% interest, compounded annually, from November 30, 1970.

ARTICLE 10, 10.7.1

**10.7.1**  In the case of an Employee who retires under this Plan or where continuous service is terminated or a survivor protection benefit exists, the Employee, or in the event of his death, his spouse, child, parent or other blood relative, or heir, or personal representative, shall receive the excess remaining, if any, of the amount credited to the Employee's account under the Thompson Wire Profit Sharing Plan as of November 30, 1970 plus 4% interest, compounded annually, from November 30, 1970 after all payments required by this Plan have been made, including without limitation the "special payment" referred to in section 4.1 above.

**10.7.2**  The Company, the Board and/or the Trustee or Trustees of any trusts established heretofore or hereafter for the purpose of paying pension and survivor benefits shall have no other or further obligation under this Plan to or with respect to Employees or Pensioners, or to their spouses, heirs, or personal representatives, than to make payments herein provided.  In the event that the Employee or Pensioner shall have died and payment is to be made to someone other than the surviving spouse of the Employee or Pensioner, the Board, in its complete discretion, shall decide to whom such payment shall be made, and any payment so made shall be a complete discharge of the Company, the Board and the Trustee or Trustees as aforesaid.

**10.7.3**  A covered employee may not designate someone other than his spouse as his Profit Sharing death beneficiary unless his wife consents.  In addition, a married Employee may not elect a lump sum distribution under this section 10.7 which is greater than $3,500 without his spouse's consent. All such consents must meet the requirements of section 5.4.

52

ARTICLE 10, 10.9

**10.8**    In the event that this Plan is merged with or consolidated into, or its assets or liabilities transferred to another plan, then each Employee, who was such on the date of such merger, consolidation or transfer, shall be entitled to receive under such other plan a benefit not less than the benefit he would have received hereunder had this Plan terminated as of the date of, but prior to, such merger, consolidation or transfer. No such merger, consolidation or transfer shall automatically increase such an Employee's interest hereunder. It is the intent and purpose of this section to insure only that no such Employee shall incur a loss in his benefit arising either by virtue of such a merger, consolidation or transfer or by a subsequent termination of the resulting or surviving plan. Upon a complete or partial termination of the pension plan embodied herein the rights of all affected Employees to benefits accrued to the date of such termination shall automatically become fully vested and nonforfeitable.

**10.9**    In the event that the pension plan embodied in this Plan shall be terminated, the assets hereof shall be applied, subject to the prior approval of the Internal Revenue Service and of the **Pension Benefit Guaranty Corporation**, after taking into account the provisions of section 2.1, in accordance with the order of priority hereinafter set forth. If the assets hereof shall be insufficient to provide the full benefits described in any of the classifications described below, the assets shall be allocated pro rata among all Employees and survivors in the affected classification on the basis of the present value, as of the termination date, of their respective benefits.

> **10.9.1**    First, to provide in the case of a monthly pension or survivor benefit of a retired Employee or survivor which was being paid as of the beginning of the three-year period ending on the termination date of the Plan, or which could have commenced to an Employee who was eligible to retire as of the beginning of the three-year period, or to his survivor, if the Employee had retired and if benefits had

commenced (in the normal form of annuity) as of the beginning of such period, a total monthly retirement income based on the lesser of the lowest monthly benefit paid during such three-year period and the lowest monthly retirement income amount determined for the Employee or survivor under the terms of this Plan during the five-year period ending on the termination date.

**10.9.2**  Second, to provide the monthly pension or survivor benefit of each retired Employee or survivor not included in section 10.10.1 above, provided, however:

(i)      the amount of monthly pension benefit provided with respect to an Employee or survivor eligible under this Section 10.10.2 shall not have an actuarial value which exceeds the value of a monthly benefit in the form of a life annuity commencing at age 65 equal to the lesser of: (X) the Employee's monthly gross income received from the Employer during the five consecutive calendar years in which he received his greatest income while an Employee covered by this Plan (or actual calendar years if less than five), and (Y) $750, multiplied by a fraction, the numerator of which is equal to the contribution and benefit base (determined under Section 230 of the Social Security Act) in effect at the time this Plan terminates and the denominator of which is such contribution and benefit base in calendar year 1974.

(ii)     the amount of monthly plan benefit under this section 10.10.2 which has been in force for less than 60 months, or any increase in the amount of benefits under this Plan which has been in force for less than 60 months will not exceed the greater of (XX) 20% of such amount determined under section 10.10.2(i), and (YY) $20 per month multiplied by the number of years (but not more than five), this Plan, or amendment, as the case may be, has been in effect.

**ARTICLE 10, 10.9.3**

10.9.3   Third, to provide any pension or survivor benefits required to provide for each Employee or survivor a total benefit equal to his total nonforfeitable benefit on such date (other than benefits becoming nonforfeitable solely on account of the termination).

10.9.4   Fourth, to provide all other benefits under this Plan.

10.10   The Plan Year, so called, of this Plan shall be a calendar year.

10.11   This Agreement constitutes the entire contract between the Company and the Union with respect to the subject of pensions and/or profit sharing and it supersedes all prior understandings and Agreements between the Company and the Union with respect thereto to Employees retiring on and after December 31, 1997. This Agreement provides for the maintenance by the Company of a frozen defined benefit pension plan on the terms and conditions of the Plan as hereinabove set forth, and this Agreement also provides for the maintenance by the Company of a Section 401(k) defined contribution pension plan effective from and after January 1, 1998 such plan to include terms and conditions substantively identical to the terms of the Thompson Steel Company, Inc. USWA Local 7773 Section 401(k) Pension Plan annexed hereto (the "Defined Contribution Plan"). Subject to the approvals and qualifications and continuing approvals and qualifications relating to the Plan and the Defined Contribution Plan as herein provided, this Agreement shall be effective September 10, 1997 except as otherwise provided herein and shall remain in effect until September 10, 2000 and thereafter,

subject to the right of either party on 120 days' written notice served on or after September 10, 2000, to terminate this Agreement.

**UNITED STEELWORKERS**
**OF AMERICA AFL-CIO**
**ON BEHALF OF LOCAL**          **THOMPSON STEEL**
**UNION NO. 7773**              **COMPANY, INC.**

By:                             By:

55

# ILLINOIS WORKERS' COMPENSATION COMMISSION
## SETTLEMENT CONTRACT LUMP SUM PETITION AND ORDER

WC482-229641/kmd

**ATTENTION.** Please type or print. File four copies of this form. Attach a recent medical report. Answer all questions.

Workers' Compensation Act __X__  Occupational Diseases Act _____  Fatal case? No __X__ Yes _____ Date of death _____

## BASIL FRYE
Employee/Petitioner

Case #  **07 WC 24984**

v.

Setting  **CHICAGO**

## THOMPSON STEEL COMPANY
Employer/Respondent

To resolve this dispute regarding the benefits due the petitioner under the Illinois Workers' Compensation or Occupational Diseases Act, we offer the following statements. We understand these statements are not binding if this contract is not approved.

| **Basil Frye** | **3100 N Emerson St.** | **Franklin Park** | **IL** | **60131** |
|---|---|---|---|---|
| Employee's name | Street Address | City | State | Zip code |
| **Thompson Steel Co.** | **9470 King St.** | **Franklin Park** | **IL** | **60131** |
| Employer's name | Street Address | City | State | Zip code |

Employee's Social Security #  __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__   Male __X__  Female _____   Married __X__  Single _____
# Dependents under age 18  __0__   Birthdate  __July 09, 1943__   Average weekly wage  **$861.65**

Date of accident  __07/18/05__

How did the accident occur?  **Injured while working**

What part of the body was affected?  **Right arm**

What is the nature of the injury?  **Right shoulder strain**

The employer was notified of the accident orally  __X__  in writing _____   Return-to-work date  **07/29/05; 01/09/06**

Location of accident  __Franklin Park, IL__   Did the employee return to his or her regular job?  Yes __X__  No _____
If not, explain below and describe the type of work the employee is doing, the wage earned, and the current employer's name and address.

**TEMPORARY TOTAL DISABILITY BENEFITS:** Compensation was paid for  __12__  weeks at  **$574.43**  /week
The employee was temporarily totally disabled from  **07/25/05**  through  **07/28/05**
    **10/21/05**       **01/08/06**
**MEDICAL EXPENSES:** The employer has __X__ has not __ paid all medical bills. List unpaid bills in the space below.

**PREVIOUS AGREEMENTS:** Before the petitioner signed an *Attorney Representation Agreement,* the respondent or its agent

offered in writing to pay the petitioner $  __42,522.43__  as compensation for the permanent disability caused by this injury.

An arbitrator or commissioner of the Commission previously made an award on this case on  __NO AWARD__  regarding

TTD _____  Permanent disability _____  Medical expenses _____  Other _____

IC5 12/04 100 W. Randolph Street #8-200 Chicago, IL 60601 312/814-6611 Toll-free 866/3252-3033 Web site: www.iwcc.il.gov
Downstate offices: Collinsville 618/346-3450  Peoria 309/671-3019  Rockford 815/987-7292  Springfield 217/785-7084
Disclosure of this information to the Commission is done voluntarily under 820 ILCS 305/6(b).

**EXHIBIT**
tabbies
**C**

TERMS OF SETTLEMENT:    Attach a recent medical report signed by the physician who examined or treated the employee.

Respondent agrees to pay and petitioner agrees to accept _$48,597.06_____ in a lump sum and in full and final settlement of all claims for benefits past, present and future based on injuries arising out of an accident on or about 07/18/05. This settlement is based on 94 weeks PPD (40 % loss of use of the right arm) pursuant to Section 8(e)(10) of the Workers' Compensation Act. The respondent will pay all reasonable, necessary and related medical expenses incurred through contract approval. Petitioner hereby foregoes any right to review or reopen the settlement and agrees that all rights under Section 8(a) and 19(h) are expressly waived. The Petitioner asserts that he has not applied for and is not currently receiving Medicare and that he has not applied for and is not currently receiving SSDI. Respondent reserves any and all lien rights under Section 8(b) of the Workers' Compensation Act. This said sum after taking into consideration petitioner's present life expectancy of 5.8 years and after deducting fees and expenses of $3,131.07 results in a weekly equivalent of $52.04     for the duration of such life expectancy.

| | | |
|---|---|---|
| Total amount of settlement | $ | 48,597.06 |
| Deduction: Attorney's fees | $ | 3,037.32 |
| Deduction: Medical reports, X-rays | $ | 50.00 medical records |
| Deduction: Other (explain) | $ | 43.75 exhibits & reports-copies |
| Amount employee will receive | $ | 45,465.99 |

PETITIONER'S SIGNATURE. Attention, petitioner. Do not sign this contract unless you understand all of the following statements. I have read this document, understand its terms, and sign this contract voluntarily. I believe it is in my best interests for the Commission to approve this contract. I understand that I can present this settlement contract to the Industrial Commission in person. I understand that by signing this contract, I am giving up the following rights:

1. My right to a trial before an arbitrator;
2. My right to appeal the arbitrator's decision to the Commission;
3. My right to any further medical treatment, at the employer's expense, for the results of this injury;
4. My right to any additional benefits if my condition worsens as a result of this injury.

| | | | |
|---|---|---|---|
| _(signature)_ | Basil Frye | 847-671-2644 | 12/3/07 |
| Signature of petitioner | Name of petitioner (please print) | Telephone number | Date |

PETITIONER'S ATTORNEY. I attest that any fee petitions on file with the IWCC have been resolved. Based on the information reasonably available to me, I recommend this settlement contract be approved.

| | |
|---|---|
| _(signature)_ | |
| Signature of attorney | Date |

Robert Williams #562
Name of attorney and IIC attorney code # (please print)

Law Offices of Robert B. Williams
Firm name

N. LaSalle Street, Suite 2119
Street address

Chicago, IL  60602
City                State        Zip code

(312)782-9400
Telephone number

RESPONDENT'S ATTORNEY. I attest that any fee petitions on file with the IWCC have been resolved. The respondent agrees to this settlement and will pay the benefits to the petitioner or the petitioner's attorney, according to the terms of this contract, promptly after receiving a copy of the approved contract.

| | |
|---|---|
| _(signature)_ | |
| Signature of attorney | Date |

Thomas Strzalka    #1596
Name of attorney and IIC attorney code # (please print)

MEACHUM & TRAFMAN (312) 726-6317
Firm Name                                   Telephone number

10 South LaSalle Street Suite 2800
Street address

Chicago            IL        60603
City                State        Zip code

LIBERTY MUTUAL INSURANCE
Name of respondent's insurance or service company

APPROVED BY AUTHORITY OF THE ILLINOIS WORKERS' COMPENSATION COMMISSION
Pursuant to provisions of the Workers' Compensation and Workers' Occupational Diseases Acts

ORDER OF ARBITRATOR OR COMMISSIONER:
Having carefully reviewed the terms of this contract, in accordance with Section 9 of the Act, by my stamp I hereby approve this contract, order respondent to promptly pay in a lump sum the total amount of settlement stated above, and dismiss this case.

DEC   4  2007

page 2    "This form is a true and exact copy of the current Industrial Commission Form IC9 as revised 12/ 04."

Hy: Kurt A. Carlson, Arbitrator

# ILLINOIS WORKERS' COMPENSATION COMMISSION
## SETTLEMENT CONTRACT LUMP SUM PETITION AND ORDER

WC482-238468kmd

ATTENTION. Please type or print. File four copies of this form. Attach a recent medical report. Answer all questions.

Workers' Compensation Act __X__    Occupational Diseases Act _____    Fatal case? No __X__ Yes _____    Date of death _____

**BASIL FRYE**

Employee/Petitioner

Case #    07 WC 24985

v.

Setting    CHICAGO

**THOMPSON STEEL COMPANY**

Employer/Respondent

To resolve this dispute regarding the benefits due the petitioner under the Illinois Workers' Compensation or Occupational Diseases Act, we offer the following statements. We understand these statements are not binding if this contract is not approved.

| **Basil Frye** | 3100 N Emerson St. | **Franklin Park** | IL | 60131 |
|---|---|---|---|---|
| Employee's name | Street Address | City | State | Zip code |

| **Thompson Steel Co.** | 9470 King St. | **Franklin Park** | IL | 60131 |
|---|---|---|---|---|
| Employer's name | Street Address | City | State | Zip code |

Employee's Social Security #    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    Male __X__ Female _____    Married __X__ Single _____

# Dependents under age 18    **0**    Birthdate    **July 09, 1943**    Average weekly wage    **$781.65**

Date of accident    **07/12/06**

How did the accident occur?    **Injured while working**

What part of the body was affected?    **Left leg**

What is the nature of the injury?    **Left leg contusion**

The employer was notified of the accident orally    __X__ in writing _____    Return-to-work date    **N/L/T**

Location of accident    **Franklin Park, IL**    Did the employee return to his or her regular job?    Yes __X__ No _____
If not, explain below and describe the type of work the employee is doing, the wage earned, and the current employer's name and address.

**TEMPORARY TOTAL DISABILITY BENEFITS:** Compensation was paid for __0__ weeks at __$521.10__ /week
The employee was temporarily totally disabled from    **No Lost Time**    through _____
**MEDICAL EXPENSES:** The employer has __X__ has not __ paid all medical bills. List unpaid bills in the space below.

**PREVIOUS AGREEMENTS:** Before the petitioner signed an *Attorney Representation Agreement*, the respondent or its agent

offered in writing to pay the petitioner $ __25,208.21__ as compensation for the permanent disability caused by this injury.

An arbitrator or commissioner of the Commission previously made an award on this case on __NO AWARD__ regarding

TTD _____    Permanent disability _____    Medical expenses _____    Other _____

IC5 12/04 100 W. Randolph Street #8-200 Chicago, IL 60601 312/814-6611 Toll-free 866/3252-3033 Web site: www.iwcc.il.gov
Downstate offices: Collinsville 618/346-3450    Peoria 309/671-3019    Rockford 815/987-7292    Springfield 217/785-7084
Disclosure of this information to the Commission is done voluntarily under 820 ILCS 305/6(b).



EXHIBIT

D

ERMS OF SETTLEMENT:     Attach a recent medical report signed by the physician who examined or treated the employee.

espondent agrees to pay and petitioner agrees to accept $35,291.50 in a lump sum and in full and final settlement of l claims for benefits past, present and future based on injuries arising out of an accident on or about 07/12/06. This ttlement is based on 75.25 weeks PPD (35 % loss of use of the left leg) pursuant to Section 8(e)(12) of the Workers' ompensation Act. The respondent will pay all reasonable, necessary and related medical expenses incurred through contract pproval. Petitioner hereby foregoes any right to review or reopen the settlement and agrees that all rights under Section 8(a) d 19(h) are expressly waived. The Petitioner asserts that he has not applied for and is not currently receiving Medicare and at he has not applied for and is not currently receiving SSDI. Respondent reserves any and all lien rights under Section b) of the Workers' Compensation Act. This said sum after taking into consideration petitioner's present life expectancy of 5.8 years and after deducting fees and expenses of $5,135.40 results in a weekly equivalent of $34.52 for the ration of such life expectancy.

| | | |
|---|---|---|
| otal amount of settlement | $ | 35,291.50 |
| eduction: Attorney's fees | $ | 5,041.65 |
| eduction: Medical reports, X-rays | $ | 50.00 medical records |
| eduction: Other (explain) | $ | 43.75 exhibits & reports-copies |
| mount employee will receive | $ | 30,156.10 |

ETITIONER'S SIGNATURE. *Attention, petitioner. Do not sign this contract unless you understand all of the following statements.* I have read this ocument, understand its terms, and sign this contract voluntarily. I believe it is in my best interests for the Commission to approve this contract. I nderstand that I can present this settlement contract to the Industrial Commission in person. I understand that by signing this contract, I am giving p the following rights:

    1. My right to a trial before an arbitrator;
    2. My right to appeal the arbitrator's decision to the Commission;
    3. My right to any further medical treatment, at the employer's expense, for the results of this injury;
    4. My right to any additional benefits if my condition worsens as a result of this injury.

| | | | |
|---|---|---|---|
| *Basil A. Frye* | Basil Frye | 847-671-2644 | 12/3/07 |
| ignature of petitioner | Name of petitioner (please print) | Telephone number | Date |

ETITIONER'S ATTORNEY. I attest that any fee petitions on file ith the IWCC have been resolved. Based on the information asonably available to me, I recommend this settlement contract e approved.

RESPONDENT'S ATTORNEY. I attest that any fee petitions on file with the IWCC have been resolved. The respondent agrees to this settlement and will pay the benefits to the petitioner or the petitioner's attorney, according to the terms of this contract, promptly after receiving a copy of the approved contract.

| | | | |
|---|---|---|---|
| ignature of attorney | Date | Signature of attorney | Date |
| Robert Williams  #562 | | Thomas Strzalka  #1596 | |
| Name of attorney and IIC attorney code # (please print) | | Name of attorney and IIC attorney code # (please print) | |
| Law Offices of Robert B. Williams | | MEACHUM & TRAFMAN (312) 726-6317 | |
| Firm name | | Firm Name | Telephone number |
| 33 N. LaSalle St., Suite 2119 | | 10 South LaSalle Street, Suite 2800 | |
| Street address | | Street address | |
| Chicago, IL 60602 | | Chicago     IL     60603 | |
| City     State     Zip code | | City | |
| (312)782-9400 | | LIBERTY MUTUAL INSURANCE COMPANY | |
| Telephone number | | Name of respondent's insurance company (please print) | |

APPROVED BY AUTHORITY OF THE ILLINOIS WORKERS COMPENSATION COMMISSION pursuant to the provisions of the Workers Compensation/Occupational Disease Act.

DEC 19 2007

ORDER OF ARBITRATOR OR COMMISSIONER:
Having carefully reviewed the terms of this contract, in accordance with Section 9 of the Act, by my stamp I hereby approve this contract, order the respondent to promptly pay in a lump sum the total amount of settlement stated above, and dismiss this case.

IC5 page 2     "This form is a true and exact copy of the current Industrial Commission form as revised 12/04."

By: Robert (signature)

# THOMPSON STEEL COMPANY, INC.

**Executive Offices**
120 Royall Street, Canton, MA 02021
TEL: (781) 828-8800, FAX: (781) 828-5082

May 30, 2007

Mr. Basil A. Frye
3100 Emerson Street
Franklin Park, IL 60131

Dear Mr. Frye:

We have received notification from Liberty Mutual as it pertains to the recent settlement of your Worker's Compensation case. I regret to inform you that in accordance with the Collective Bargaining agreement between Thompson Steel Company, Inc. and the United Steelworkers of America on behalf of Local #7773, your pension payments will be further delayed. Article 4, 4.8 of the Supplemental Agreement Covering Pensions between Thompson Steel Company, Inc. and United Steelworkers of America provides for the deduction of "any amount paid to or on behalf of any Employee or Pensioner on account of injury or occupational disease causing disability in the nature of a permanent disability for which the Company is liable".

Your recent settlement of $67,730.64 will be used to offset pension payments commencing June 1, 2007, to which you would otherwise be entitled. The length of deferral will be the settlement amount divided by your monthly pension benefit of $688.13. This will result in a deferral of eight (8) years and two (2) months before you will be eligible to begin receiving benefits under the plan.

The pension payment records will be revised to indicate the date you will resume receipt of pension benefits and payment will commence with no further required action on your part. Please notify the Human Resource Office at 120 Royall Street, Canton, MA 02021 if your permanent address changes.

Sincerely,

Andrea Breheny
Human Resource Manager





EXHIBIT

E

Boston, MA • Chicago, IL • Dayton, OH • Detroit, MI • Greenville, SC • Hartford, CT • Los Angeles, CA • Paulding, OH • Rome, GA

THOMPSON STEEL COMPANY, INC.
RETIREMENT PLAN FOR MEMBERS OF USWA LOCAL #7773
RETIREMENT PLAN OPTIONS

· The options outlined below for your retirement of **May 11, 2007** are based on calculations for a **Unreduced Early Retirement, Article III, 3.2.1**, as defined in the Supplemental Agreement Covering Pensions between Thompson Steel Company, Inc. and employees who are members of USWA local #7773.

OPTION 1:     A Joint and Survivor Annuity <u>without</u> a Lumpsum election of your Profit Sharing Balance.

This option will entitle you to receive **$688.13** per month beginning on **September 1, 2007**, with **$344.07** per month continued for the life of your beneficiary upon your death.

OPTION 2:     A Single Life Annuity <u>without</u> a Lumpsum election of your Profit Sharing Balance.

This option will entitle you to receive **$759.53** per month beginning on **September 1, 2007** and continuing only for your lifetime.

OPTION 3:     A Joint and Survivor Annuity <u>with</u> a Lumpsum election of your Profit Sharing Balance.

This option will entitle you to receive your full Profit Sharing Balance of **$8,527.81** as of **June 1, 2007** and will defer your monthly benefit of **$688.13** until **July 1, 2008**, with a partial payment of **$417.88** to be paid on **June 1, 2008.**

OPTION 4:     A Single Life Annuity <u>with</u> a Lumpsum election of your Profit Sharing Balance.

This option will entitle you to receive your full Profit Sharing Balance of **$8,527.81** as of **June 1, 2007** and will defer the monthly benefit of **$759.53** until **June 2, 2008** with a partial payment of **$586.55** to be paid on **May 1, 2008.**

If you are intending to retire please complete the attached form, FP-8, indicating the option you wish to retire with.

The pension start date includes a 3 month deferral due to being eligible for the **Special Vacation Benefit** of **$5,156.40** which will be paid to you on **June 1, 2007** in accordance with the contract. If you are taking a lump sum distribution, the special vacation benefit will be part of that distribution, not in addition to it.

Form FP-7
Attachment
Rev. 4/91